**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

CHRISTOPHER WOZNIAK,

        Plaintiff,

        v.

WARNER BROS. ENTERTAINMENT INC.,

        Defendant.

DC COMICS,

        Third-Party Plaintiff,

        v.

CHRISTOPHER WOZNIAK,

        Third-Party Defendant.

Case No. 1:22-cv-08969-PAE

**DECLARATION OF R. TERRY PARKER**
**IN OPPOSITION TO THE MOTION FOR SUMMARY JUDGMENT FILED BY**
**WARNER BROS. MEDIA'S MOTION FOR SUMMARY JUDGMENT**

I, R. Terry Parker, declare as follows:

1.      I am the attorney for the plaintiff and third-party defendant Christopher Wozmiak ("Wozniak"), in the above-captioned action.

2.      I submit this declaration in opposition to the motion to for summary judgment filed by the defendant Warner Bros. Entertainment Inc. and third-party plaintiff DC Comics.

3.      Attached hereto as Exhibit A is a copy of excepts from the transcript of the deposition of a 30(b)(6) witness for DC Comics, Paul Levitz, taken July 17, 2023.

4.      Attached hereto as Exhibit B is a copy of excepts from the transcript of the

deposition of a third-party witness, Chuck Dixon, taken September 1, 2023.

I declare that the foregoing is true and correct under penalty of perjury under the laws of the United States.

Executed on this 5th day of November, 2023.

_/s/ R. Terry Parker_
R. Terry Parker

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 5th day of December, 2023, I caused a copy of the foregoing to be filed via ECF by which all counsel of record for the parties are served.

*/s/ R. Terry Parker*
R. Terry Parker

# EXHIBIT A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------x
CHRISTOPHER WOZNIAK,

                          Plaintiff,

V.

WARNER BROS. ENTERTAINMENT, INC.,

                          Defendants.

Civil Action No. 22-cv-08969 (PAE)

---------------------------------------x
DC COMICS,
                    Third-Party Plaintiff,

V.

CHRISTOPHER WOZNIAK,


                    Third-Party Defendant.
---------------------------------------x
                          July 17, 2023
                          10:00 a.m.




    EXAMINATION of Paul Levitz, pursuant to

Subpoena, held at the above time and place

before Larin Kaywood, a Notary Public within and

for the State of New York.



Page 2

```
 1
 2        A P P E A R A N C E S:
 3
 4    R. TERRY PARKER LAW
         Attorneys for Plaintiff
 5       43 West 43rd Street, Suite 275
         New York, New York 10036
 6    BY:   TERRY PARKER, ESQ.
      EMAIL:  TERRY@RTERRYPARKERLAW.COM
 7
 8    FROSS, ZELNICK, LEHRMAN, & ZISSU, PC.
         Attorneys for Defendant
 9       151 W 42nd Street
         17th Fl
10       New York, New York 10036
      BY:    JAMES WEINBERGER, ESQ.
11       ANDREW NIETES, ESQ.
      Email:  JWEINBERGER@FZLZ.COM
12
13
14
15        *       *       *
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2        S T I P U L A T I O N S
 3    IT IS HEREBY STIPULATED AND AGREED by and
 4    between the attorneys for the respective parties
 5    herein, that filing, sealing and certification,
 6    and the same are, hereby waived.
 7
 8    IT IS FURTHER STIPULATED AND AGREED that all
 9    objections except as to the form of the
10    question, shall be reserved to the time of the
11    trial.
12
13    IT IS FURTHER STIPULATED AND AGREED that the
14    within deposition may be signed and sworn to by
15    an officer authorized to administer an oath,
16    with the same force and effect as if signed and
17    sworn to before the Court.
18
19
20             * * *
21
22
23
24
25
```

```
 1
 2             Paul Levitz
 3    P A U L   L E V I T Z, the witness herein,
 4    having been first duly sworn by a Notary Public
 5    in and of the State of New York, was examined
 6    and testified as follows:
 7    EXAMINATION BY
 8    MR. PARKER:
 9        Q.  Would you please state your full
10    name for the record?
11        A.  Paul Levitz.
12        Q.  What is your current address?
13        A.  7 Deforest Drive, Cortlandt Manor,
14    New York 10567.
15        Q.  Good morning, Mr. Levitz.
16        A.  Good morning.
17        Q.  My name is Terry Parker.  I
18    represent the third-party defendants.  You have
19    already entered your name into the record, so
20    I'll scratch that question off of my list.
21             Have you ever been deposed before?
22        A.  Many times.
23        Q.  Good.  So you probably know some of
24    the basic rules and so I'll go through them any
25    way.  This is a question and answer format.
```

```
 1
 2             Paul Levitz
 3    I'll be asking you some questions; and the court
 4    reporter will be writing those questions and you
 5    will be answering those questions to the best of
 6    your ability.
 7             She will be creating a transcript
 8    that will show my question and your attorney
 9    your attorney may object from time to time
10    unless they instruct you not too; is that
11    understood?
12        A.  Yes.
13        Q.  In order for us to have a clean
14    record for the questions and answer.  I need you
15    to answer verbally, if you nod your head or say
16    yes, or you articulate it in some fashion, that
17    doesn't get captured by the reporter.
18             Please wait until I finish the
19    question before you begin the answer, we don't
20    want an over lap of us speaking at the same time
21    that makes it a nightmare for the reporter; is
22    that understood?
23        A.  Yes.
24        Q.  If you need a break at any time, let
25    me know as long as there is no question pending
```



Paul Levitz

1
2
3    A.  No.
4    Q.  We'll I'll represent to you this is
5  what we call a Notice of Deposition.
6        And this is kind of a formal
7  mechanism by which I tell your counsel that we
8  are going to have the deposition today and in
9  this deposition notice there is a list of
10  definitions, and then there are a list of
11  topics?
12    A.  Yes.
13    Q.  It's my understanding that you're
14  here today to testify as to the DC acquisitions
15  of the copyrights of the Batman copyright of
16  material; is that accurate?
17    A.  I believe that is one of the things
18  that they suggested that I was here for.
19        MR. WEINBERGER:  I can confirm that.
20    Q.  And you are here to testify as DC
21  come imagines acquisitions of the copyrights of
22  the Batman characters; is that right?
23        MR. WEINBERGER:  I can confirm that
24    for the witness.
25    Q.  And you are here to discuss topics

Paul Levitz

1
2
3  of one and two, and they are also you are here
4  to testify the topic number nine that is DC
5  Comics policies and procedures for accepting
6  proposed material from freelance writers from
7  January 1st, 1990 to January of 2003.
8        MR. WEINBERGER:  I confirm that, I
9    would like to note for the record DC perspective
10  I don't think you mentioned topic three, he is
11  testifying on the companies behalf on one two
12  three and nine in the notice.
13        But with respect to topics, one
14  through three, I understand that you're using
15  defined terms to delineate between them but from
16  DC's perspective they are all one in the same.
17  I don't know if there is any need to
18  differentiate between topics one, two and three.
19        MR. PARKER:  I want to go over those
20  defined terms so that we know what we are
21  talking about so that we something that is
22  specific and understood.
23        I'm going to get rid of this.  Let's
24  move up and look at the deposition of these
25  terms.  Let's refer now to the definition of

Paul Levitz

1
2
3  number five in the first to determined Batman
4  copyrighted material; do you see that?
5    A.  Yes.
6    Q.  And that is defined meaning words
7  referred to in the third-party complaint by DC
8  Comics at Batman writer material including the
9  words referred to in the third-party complaint.
10        Is that a definition that you
11  understand?
12    A.  I have seen the words but I haven't
13  seen the words in the exhibit that you're
14  referring to.
15        MR. WEINBERGER:  You can ask a
16    question.
17    Q.  Let's stay with the term Batman
18  characters.  I'm looking at number six now, the
19  term Batman characters is defined as referenced
20  in the third-party complaint; is it not?
21    A.  That is what it says.
22    Q.  I think it would help if we pull up
23  the third-party complaint?
24        Mr. Levitz, is this a document that
25  you have seen before?

Paul Levitz

1
2
3    A.  No.
4    Q.  I'll represent to you that this is
5  the third-party complaint by DC Comics Chris,
6  you are familiar with the lawsuit, or are you
7  not?
8    A.  I am mildly familiar with the
9  lawsuit.
10    Q.  I'm going to refer us now to
11  paragraph nine.  Paragraph nine states certain
12  -- Batman's creation in 1939, certain other
13  related characters and other -- original
14  fanciful elements have appeared in the Batman
15  plotlines, including but not limited to Robin
16  aka Dick Grayson, The Riddler aka Edward Nygma,
17  Commissioner James Gordon, Barbara Gordon aka
18  Batgirl, Two Face, The Joker, Batman's butler
19  Alfred, the Batmobile and the fictional city
20  Gotham City, among many others (together, the
21  "Batman Characters").  So I understand the
22  Batman characters as being defined in this
23  paragraph is this a definition that you
24  understand.
25        Do you understand that?

Paul Levitz

1
2
3    A.  I believe that I understand it.
4    Q.  So since Batman's creation in 1939,
5  what is your understanding of that creation?
6    A.  I'm sorry.  Would you repeat your
7  question?
8    Q.  The opening phrase since Batman's
9  creation in 1939?
10    A.  Yes.
11    Q.  What is your understanding of that
12  phrase "Batman's creation in 1939?"
13    A.  I think it's plain English.  Phrase
14  that just describes the fact that there is a
15  creative process that resulted in the character;
16  the creative property Batman and the assumption
17  here is that it took place in 1939 and that is
18  probably not entirely accurate.
19    Q.  Why do you think it's not entirely
20  accurate?
21    A.  If I remembering when the detectives
22  comic number 27 was first published the process
23  probably began in late 1938.
24    Q.  Do you understand the phrase?
25     Do you understand the phrase certain

Paul Levitz

1
2
3  other related characters and other original
4  fanciful elements?
5    A.  I believe it's an attempt to put a
6  definitional term to the fact that there are
7  original creative element within the stories of
8  Batman that are characters or objects that are
9  distinctive and original.
10    Q.  Can you identify any fanciful
11  elements that is identified here?
12    A.  There is a list in the paragraph
13  that includes a number of characters.  I would
14  also say that the batcave, the batter rank, the
15  utility belt, and many other things, and
16  villains that were introduced.
17    Q.  Bathound, would that be one?
18    A.  That certainly would be.
19    Q.  That might?
20    A.  Yes.
21    Q.  Kathy?
22    A.  Yes.
23    Q.  Batwoman?
24    A.  Yes.
25    Q.  Okay.  Any other faceable (sic)

Paul Levitz

1
2
3  element that you can think of?
4    A.  We could probably sit here for the
5  next hour trying to remember all of the
6  different elements of the process.  If you're
7  talking about the property as it's extended
8  overall of these years.
9    Q.  Right now we are just looking at
10  1939?
11    A.  1939, you have doctor dead, if your
12  so specific to 1939 most of these element have
13  not appeared yet, that are a numerated here.
14    Q.  Well, was Robin?
15    A.  No.
16    Q.  Was he created in 1939?
17    A.  He may have been created at the very
18  end 1939, but he was not published until 1940.
19    Q.  And Miller?
20    A.  1940, somewhere.
21    Q.  And Mr. Gordon?
22    A.  The original story, and if your
23  defining that as 1939 let's stick with that.
24    Q.  Let's go through them one at a time.
25     This term Robin A.K.A Dick Grayson,

Paul Levitz

1
2
3  what is your understanding of that term?
4    A.  The original character as had a
5  secret identity as Dick Grayson.
6    Q.  What is the next one Riddler, what
7  is your understanding of that character?
8    A.  Dylan who taunted Batman by offering
9  difficult to solve right isles that was accused
10  of the crimes that he was about to commit.
11    Q.  And the commission of James Gordon;
12  what is your definition of it?
13    A.  Circumstance lying the police force
14  in 1939 and in many Batman stories thereafter.
15    Q.  Barbara Gordon, bat girl; what is
16  your understanding of that?
17    A.  That character was in 1968 roughly
18  as the daughters of the commission of Gordon,
19  she was the Liberian who sort of had a crush on
20  Batman and took on the identity of bat girl.
21    Q.  And the term Joker, two phase, I'm
22  skipping.
23     What is the understanding of the
24  Joker, what is your understanding of that term?
25    A.  That was introduced in Batman in

Paul Levitz

1940.
Q. And Batman, Alfred, where did that
come from?
A. He was introduced in the Batman
stories, I believe in 1941, and then
significantly modified after the first Batman
serial, but normally known Aspen any worth in
the William family Butler.
Q. The term Batman mobile. What is
your understanding of the bat mobile?
A. The distinctive car that the Batman
operates which the visual has changed over the
years but it always had some level of unique
design element that identify it as a bat mobile,
either a batt head, hood element or other
features like that.
Q. Any other features?
A. I'm sorry.
Q. What other features?
A. It's very, very much from decade to
decade. Distinctive, the tail changed at one
point or another, things that are of Batman.
Q. And I assume that you would

Paul Levitz

understand that the Batman was a Batman
character as well that can be added to the --
A. I didn't hear you clearly.
Q. Is a Batman, Batman that can be
added to this list, in paragraph nine?
A. Sure.
Q. How would you describe the Batman
character?
A. The most typical Batman stories. He
is a boy named Bruce Wayne, who had seen his
parents get murdered when he was a child and has
sworn he didn't see the murder by elevating in
that City of Gotham; and is inspired by putting
on the mask and becoming Batman.
Q. And did the Batman character is an
original creation?
A. As original as anything gets.
Q. Who created him?
A. The original Batman stories are by
Bob Kane and Bill Sienkiewicz.
Q. Who is Bob Kane?
A. Bob Kane was born Robert Kane in New
York City in the early part of the 20th century.

Paul Levitz

I wouldn't remember the date offhand. But I
would guess around 1920.
He was one of the earliest
cartoonist in the nations field of comic books
in the 1930s. Predominantly a cartoonist.
He did some work for the DCs
predecessors and interest and acquired his fame
and his success with the creation of Batman and
it's publication starting in 1939.
Q. And so earlier I think that you made
a reference to Batman being created roughly in
1938 is that a reference to Bob Kane's creation
of that man, or would you say that Bob Kane
created that man in 1938?
A. I think Bob Kane and Bill
Sienkiewicz began the creation of 1938 given
what the publication dates are.
Q. Who is Bill Finger?
A. When Bob Kane presented the original
rough sketch for Batman to the editor what would
be DC Comics he didn't have a story behind that.
And the editor man Vincent Sullivan, said go out
and get a writer to work and Bob was a fellow

Paul Levitz

graduate of the same high school, I think older
than Bob, somewhat a professional writer
already. He began working as the ghost writer
for Bob Kane on the earlier stories, none to the
others and the industry from the beginning.
Q. Is it your opinion or you would say
that Bill or Bob Kane would come together from
the Batman in 1938?
A. Yes.
Q. All right. And what makes the
Batman original?
MR. WEINBERGER: Objection.
A. My view of that as a Bill
Sienkiewicz, is that the combination of element
visually and from the story standpoint added up
to original character.
Q. And I have to break them down, are
you referring to the distinct and visual
features?
A. Combination of distinctive and
visual and he progressively becomes more
original overtime as more and more things are
added and are making them more distinguishable



```
1
2                 Paul Levitz
3    affixed amount and in lieu of the full
4    extension.
5         Q.  And was there hesitant to provide a
6    full extension that you recall?
7         A.  I don't know if I would describe it
8    as hesitance, but it was a negotiated solution
9    from a request from people.  The companies sure
10   try and pay less if they can.
11        Q.  What was the position of Debra Kane
12   and Elizabeth Kane as to why they deserve more?
13        Objection.
14        A.  I was not present for the
15   discussion, but I assume it produced itself to
16   Batman is wonderful, Batman is making you
17   billions of dollars and give us money.
18        Q.  On what grounds do they think they
19   deserve money?
20        A.  The success of Batman and it being
21   based on Bob Kane's initial idea.
22        Q.  Initial idea, or initial creation?
23        A.  I don't know if there is a
24   difference between the two.
25        Q.  So I'll let you read the letter
```

```
1
2                 Paul Levitz
3    before we move on.  So the first three
4    paragraphs there?
5         A.  Okay.
6         Q.  You have gotten to the bottom of the
7    page, correct?
8         A.  Yes. It's pretty straight forward.
9         Q.  So do you have any reason why
10   Deborah Kane's signature isn't on the document?
11        A.  Since I haven't seen the document. I
12   have no idea. I know she agreed to the deal.
13        Q.  You know that Deborah Kane agreed to
14   the deal?
15        A.  Yes, it may have been done encounter
16   parts, or something like that.
17        MR. PARKER:  There is another
18        version of this document produced with
19        her signature.  I would ask that you
20        produce that.
21        MR. WEINBERGER: If you can go to the
22        next page. There you go.  It's already
23        produced.
24        Q.  Okay.  This is the first time, I'm
25   looking at the paragraph that begins, "that you
```

```
1
2                 Paul Levitz
3    each knowledge that the Batman property, and
4    I'll copyrights trademarks read the paragraph.
5         You each knowledge that the Batman
6    property, and all copyrights, trademarks, and
7    all other rights therein are owned solely and
8    exclusively by DC.
9         You can further acknowledge that all
10   work rendered by Kane with respect to the Batman
11   property was rendered by DC, or as an employee
12   for DC, pursuant to a written work for hire
13   agreement with DC; and or at the instance and
14   expense and under the supervision and control of
15   DC; and therefore as work made for hire for DC,
16   and that neither of you as the successor or
17   interest to Kane have any copyright interest in
18   the Batman property whatsoever.
19        Is that an accurate reading of that
20   paragraph?
21        A.  I think so.
22        Q.  And so this is the first time we've
23   seen work for higher language in this agreement.
24        Is there a reason that the work for
25   higher language is included here?
```

```
1
2                 Paul Levitz
3         MR. WEINBERGER: Objection to the
4         extent it requires the witness to reveal
5         the substance of any attorney-client
6         communication privilege that may have to
7         the extent that he can recall.
8         If you can otherwise answer the
9         question, go ahead.
10        A.  Since I didn't participate in the
11   drafting, I assume that it's a different lawyer
12   doing it, and again, trying for belt and
13   suspenders.
14        Q.  And so let's look at the next
15   paragraph.
16        Further, if you each agree, that if
17   and to the extent that any of Kane's
18   contributions to Batman's property are deemed
19   not to be works for hire for DC.  You
20   acknowledge this is the first time we see a
21   granted all rights from copyrights Kane to DC?
22        MR. WEINBERGER:  The same objection.
23        To the extent it requires the witness
24        not to reveal the substance of attorney
25        client communication, to the extent that
```

Paul Levitz

1
2
3    you can answer the question, go ahead?
4        A.   It became conventional at some point
5    that includes just in case deemed to be a work
6    for hire, then you agree to assign everything to
7    us.
8        Q.   So you will agree there is no
9    assignment of rights from Bob Kane to --
10       A.   I'm sorry.  There was no need for
11   assignment of rights because everything was done
12   at DCs instance and expense.  Kane had nothing
13   to assign.
14       Q.   Does DC Comics have policy and
15   procedures for accepting proposed materials from
16   freelance writers?
17       A.   From time to time DC has had
18   policies and procedures that have varied over
19   the decades.
20       Q.   Okay.  And it's from 1989 until
21   1993, or '94, was their policies and procedures
22   for freelance writing?
23       A.   Generally speaking.
24       Q.   What was that policy?
25       A.   Generally the procedure was they

Paul Levitz

1
2
3    unsolicited material from people that we don't
4    know or we have not worked with was returned
5    unread.  I think that was already a policy by
6    that time.
7            If work was submitted by someone who
8    the edit knew, or had reason to believe, it can
9    make interesting contribution then it might be
10   read and evaluated.
11       Q.   Was the policy written down
12   anywhere?
13       A.   No, not that I'm aware of.
14       Q.   Why not?
15       A.   We didn't write down a lot of stuff.
16       Q.   Well, why not?
17       A.   Lazy.
18       Q.   How was the policy communicated?
19       A.   I'm sorry, can you repeat that.
20       Q.   How was the policy communicated?
21       A.   When people become members of the
22   editorial staff they were taught on how to
23   behave as an editor.
24       Q.   And how were they taught how to
25   behave?  What type of behaviors were they

Paul Levitz

1
2
3    taught?
4        A.   That can take the rest of the
5    afternoon.  If you're asking specifically --
6        Q.   With respect to unsolicited
7    material, how is there a policy for them to
8    behave?
9        A.   There is a pile of stuff that has
10   come in from people please fill out the form
11   letter, thanks for playing our game now go away;
12   that was generally a very curete exercise for a
13   young editorial person.
14       Q.   What do you mean by that?
15       A.   I mean that there would be a pile of
16   material much of it which was sent in on a very
17   amateurish level; and having to sit there and
18   stuff it into envelops, and feeling guilty that
19   you weren't taking the time to read it, and
20   didn't have the time to spend any time on it,
21   and generally it was a very hard task for young
22   staffers
23       Q.   And the authority to review,
24   unsolicited material from people was left to the
25   editor in charge of whatever a particular

Paul Levitz

1
2
3    comment was solicited for; is that accurate?
4        A.   Broadly during the period that
5    you're talking about the editor was primarily
6    responsible.
7            If you're talking about specifically
8    Batman, which I've understood that we are
9    focused on here; the decision also might have
10   been restricted to what is in terms of the group
11   editor who was principle responsible for Batman
12   and Danny O'Neil during the period.
13       Q.   I'm sorry, who?
14       A.   Danny O'Neil.
15       Q.   Did the editors have any guideline
16   at DC Comics for the content as to what would be
17   acceptable, and what would not be acceptable for
18   publications?
19       A.   Many guidelines relevant to that.
20   It varied with the different property, or the
21   character.
22       Q.   And let's stick with Batman.
23           And so I guess that we are talking
24   about 1990, and it's my understanding that
25   Archie Goodwin was an editor at that time; is

MAGNA
LEGAL SERVICES

```
 1
 2              Paul Levitz
 3   that accurate?
 4       A.  Yes, he was mentioned in one of the
 5   titles.
 6       Q.  What was Archie's position?
 7       A.  Archie was, at that time, probably
 8   was listed as a group editor.  He was one of the
 9   most senior editorial group staffed editors that
10   we've had; extradinarly talented and experienced
11   editor and writer.
12       Q.  So Archie had a set of guidelines
13   that you've followed in terms of the content
14   that you are looking for?
15          Or did he kind of trust them to
16   determine what should be published and what
17   should not be published?
18       A.  It's a broad guidelines that is
19   applicable to all of the editors working on
20   superhero material that Archie would have fallen
21   under.
22          Beyond that the more specific stuff
23   would've been more stylistically up to him and
24   additionally, provided some guidelines that we
25   were attended to.
```

```
 1
 2              Paul Levitz
 3       Q.  And part of the guidelines how does
 4   that work?  I assume this is a physical document
 5   that the group editors and the editors have
 6   access too?
 7       A.  No, written documents.
 8       Q.  Or was it communicated to the
 9   different writers?
10       A.  No.
11       Q.  Sir, can you describe for me the
12   process by which freelance writers submitted
13   work for publication to DC Comics specifically
14   Batman stories during this time frame from 1989
15   until 1983?
16          MR. WEINBERGER: Objection.
17       A.  There is no process for them to
18   submit work, that is now the process of how
19   freelance writers work.  If you look at the
20   Batman books in specific, there were probably
21   three Batman titles being published in any given
22   month; and the specific writer would be assigned
23   to them usually in a year or multi year in a
24   period of time, and that writer would have a
25   conversation with the editors or the subsidiary
```

```
 1
 2              Paul Levitz
 3   editors of what they intend to do.
 4          And they would say yes or no, and
 5   why don't you try and go back and forth,
 6   whatever the case maybe.
 7          It was a little different with
 8   Archie, who was editing a title called Legends
 9   of the Dark Night, which it did not have a
10   single writer on a regular basis.  And then I
11   would assume, that the writer would come in and
12   say I would come in and say have an art for
13   legends, and we'll talk about it a little at
14   length for what we had in mind.
15          And then it's possible that they
16   have a two or three paragraph written of what
17   their thoughts were what they might share with
18   Archie, and Archie would say that is great, and
19   here is a contract and go and do it or no, I'm
20   not interested in that.
21       Q.  Does the same process for the pencil
22   or inker, or someone doing graphic material
23   verse written materials?
24       A.  No, there is no submission process
25   for that.
```

```
 1
 2              Paul Levitz
 3       Q.  What do you mean?
 4       A.  That is assignment.  You have a
 5   script, who is going to do it.  It's not
 6   somebody comes up and say I like to do four
 7   issues of the Dark Knight as a penciller or an
 8   issues of Batman, the editor assigns the work.
 9       Q.  How it worked by the writer
10   submitted at that time and I know that you
11   talked about it together, were they always in
12   the same room, or was it sometimes submitted by
13   mail?
14       A.  The vast majority of time in those
15   years it was in person, probably with some of
16   the writers who is more geographically distance
17   in the phone conversation, if you're talking
18   about the initial plot ideas.
19       Q.  Are you aware of Archie Goodwin keep
20   the non-soliciting material from a freelance
21   writer?
22       A.  For legends of the Dark Knight?
23       Q.  Yes?
24       A.  No.
25       Q.  For any other publication?
```

Paul Levitz

1
2
3  A.  In the course of his career,
4  certainly.
5  Q.  Okay.  I'm going to share my screen
6  and enter this as an exhibit.
7  Q.  So let's mark this as exhibit ten
8  for the record.
9  (Whereupon, Exhibit ten was marked
10  for the record.)
11  A.  Sure.
12  Q.  Paul, is this a document that you
13  have ever seen before?
14  A.  Not that I recognize, but it covers
15  one of the issues of Star Trek.
16  Q.  Correct.  And I'll represent to you
17  this is the color that was illustrated by my
18  client who will represent that he submitted it
19  to DC Comics, it was unsolicited, and he used
20  copyright material that I've assume that the DC
21  Comics would claim ownership within?
22  A.  No.
23  MR. WEINBERGER: Objection.
24  Q.  Is Star Trek not a DC Comics title?
25  A.  The comic is a DC Comics titled, the

Paul Levitz

1
2
3  underlining property is owned Paramount
4  Pictures, or whatever the hell they call
5  themselves this week, Paramount Global.
6  Q.  So you would not sue my client for
7  trademark and infringement in this particular
8  case, even if you did own this work, or if you
9  did own the copyrights for these characters,
10  would you be inclined to sue someone who
11  submitted them to an editor for possible
12  publication?
13  A.  I'm not sure that I understand your
14  point.
15  Q.  It's a hypothetical.
16  So assuming that your company owns
17  the copyright to these characters, these
18  characters are bought before -- let's just
19  strike that.
20  And so, Paul, if I represent to you
21  that my client submitted this concept to an
22  editor at DC Comics for publication,
23  unsolicited, and then DC Comics went to publish
24  this content, would you have reason to doubt me?
25  A.  I assume that your an honest man,

Paul Levitz

1
2
3  and I assume that you're telling the truth as an
4  officer of the court.
5  Q.  And is this an uncommon occurrence
6  at DC Comics where someone would unsolicited it,
7  and create contents, and try and sell it to
8  editors at DC Comics?
9  A.  It was a relatively rare occurrence
10  for cover art work for comics, but it came in
11  the 1990's period that you're talking about, it
12  would happen occasionally, it was an
13  extraordinarily rear or nonexistence process
14  with the stories of art work with the interior
15  of comics.
16  Q.  Is this a document that you have
17  ever seen before?
18  A.  Again, I don't recall this, I'll
19  assume that this is a public issues of Spectre.
20  Q.  What is an Spectre?
21  A.  Spectre it's a comic back to 1940 or
22  so, a ghostly superhero.
23  Q.  And is this image of a character
24  that you would consider DC Comics property?
25  A.  The spectre part of it.  I don't

Paul Levitz

1
2
3  know who the other person depicted there is.
4  Q.  When you say, "the spectre part of
5  it," you are referring to the face; is that
6  accurate?
7  A.  Yes.
8  Q.  And I'll submit to you, that this is
9  also a process created by my client unsolicited,
10  and submitted to DC Comics for publication and
11  was accepted by publication.
12  Do you have any reason to doubt
13  that?
14  MR. WEINBERGER: Objection.
15  A.  It would be very, very rare for that
16  to happen on a book like a spectre so I do doubt
17  but it is possible.
18  Q.  Would my client have been suing for
19  using this particular image or creating this
20  image of the spectre.
21  A.  If your client had done anything
22  with it to commercialize it, other than with us
23  he would've probably been sued or at least sent
24  a deceased desist order.
25  (Whereupon, Exhibit 11 was marked

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

Case No. 22-cv-08969(PAE)

------------------------------------

CHRISTOPHER WOZNIAK

                Plaintiff


      VS.


WARNER BROS. ENTERTAINMENT, INC.

                Defendant

------------------------------------

DC COMICS

           Third-Party Plaintiff

     VS.

CHRISTOPHER WOZNIAK

           Third-Party Defendant

------------------------------------



     Videoconference Deposition of CHUCK DIXON,

taken on behalf of the Third-Party Defendant,

through counsel, September 1st, 2023, at 9:52 a.m.,

before Nadine M. Castonguay, a Court Reporter.



Page 2

1    APPEARANCES:

2

3    FOR THE THIRD-PARTY PLAINTIFF:

4              LAW OFFICE OF R. TERRY PARKER

5              43 West 43rd Street, Ste. 275

6              New York, New York  100036-7424

7                 BY:  R. Terry Parker, Esq.

8

9

10

11    FOR THE THIRD-PARTY DEFENDANT:

12              Fross Zelncik Lehrman & Zissu P.C.

13              151 West 42nd Street, 17th Floor

14              New York, New York  10036

15                 BY: James D. Weinberger, Esq.

16

17

18

19                    -      -       -

20

21

22

23

24

25



Page 3

1                    TABLE OF CONTENTS

2

3                                        Page

4    EXAMINATION/WITNESS

5    CHUCK DIXON

6

7         By Mr. Parker:         4

8         By Mr. Weinberger:    24

9

10        Defendant's Exhibits:

11

12        Exhibit 1  Third-Party Complaint 20

13

14

15

16

17        (Exhibits retained by Mr. Parker.)

18

19

20

21

22

23

24

25



Page 6

1   pending, we can take a break.  So just let

2   us know whenever you need a break.  I don't

3   anticipate us going on for very long today.

4   But if you do want a break, let us know.

5        A.   Okay.

6        Q.   Finally, this is a very informal

7   session.  But I want you to remember that

8   you're here under oath and you're

9   testifying just as if we were in a court

10  of law.  And we expect you to tell the

11  truth to the best of your ability.  Okay?

12       A.   Yes.

13       Q.   All right.  So let's get started

14  I guess with a little background

15  information.

16                 I understand you used to be

17  a freelance contributor to DC Comics.

18  Is that accurate?

19       A.   Yes, it is.

20       Q.   When was that?  When were you a

21  freelance contributor to DC Comics?

22       A.   Roughly, 1991 to 2002.

23       Q.   What does that mean when we say

24  you were a freelance contributor for

25  DC Comics?



Page 7

1       A.    Well, I was not a company
2    employee.  Basically you would be assigned
3    jobs and paid by the page.
4       Q.    Okay.  And when were you paid,
5    after or before work was done?
6       A.    Always paid after.
7       Q.    All right.  And how did you get
8    your start at DC Comics?
9       A.    Danny O'Neil, who was the Batman
10   group editor at the time, reached out to
11   me.  I had been working for several other
12   companies at the same time.  He reached out
13   to me to write a miniseries featuring
14   Robin, Batman's sidekick.
15              I did it, it was successful
16   and from there I basically worked on a
17   number of Batman titles over the course of
18   the next 11 years.
19       Q.    Okay.  Can you name some of those
20   for us?
21       A.    Detective Comics, Night Wing.
22   I did a hundred issues over Robin monthly.
23   I worked on Cat Woman, Green Arrow,
24   Green Lantern.  I did some work on
25   The Flash, a little bit of Super Man.



1   Birds Of Prey, a title created by me and
2   Jordan Gorfinkel, a number of others.
3       Q.   So at your, during that time the
4   group editor was always Danny O'Neil?
5       A.   It was Danny O'Neil I think until
6   1999, when he retired.
7       Q.   Did you work with any other
8   editors while you were a freelance
9   contributor to DC Comics during those
10  years?
11      A.   I worked with almost every editor
12  there.  Mike McEveny, Joe Elich, Scott
13  Peterson, Dara Venchenzo, Jordan Gorfinkel.
14  Kevin Duely, Chris Duffey.
15              I mean, the list goes on and
16  on.  Following Denny -- Oh, man.  The name
17  is slipping my mind of who the group editor
18  was.
19      Q.   Did you ever submit unsolicited
20  materials to DC Comics for their
21  consideration in the hope that they would
22  publish the work that you created?
23      A.   All the time.  We were always
24  pitching specials, mini series.  Like I
25  say, Jordan Gorfinkel and I pitched Birds



Page 9

1   of Prey which became a title on its own.

2       Q.   And with respect to the Batman

3   comic, did you ever use Batman characters

4   in these unsolicited submissions to

5   DC Comics?

6       A.   Absolutely.  I was inside the

7   Batman circle, so I pretty much had free

8   reign to do whatever I wanted to do with

9   any of those characters, within the

10  restrictions the editors gave.

11                  But, yes.  I mean, I use

12  Batman characters in all of my titles.

13      Q.   When you said you were in the

14  inner circle, was there sort of written

15  permission provided to you to use Batman

16  characters in your unsolicited materials?

17      A.   No, no.  There's nothing like

18  that.  You just wanted to make certain that

19  your use of the character fit within

20  continuity.

21                  A lot of times you were told

22  you can't use that character because

23  they're on another planet currently or

24  they're dead or whatever reason.  There

25  was nothing written.  It was all creative



1  continuity conflicts that you had to work

2  out.

3      Q.   Was this permission that you

4  understood that you had?  If it wasn't

5  provided in writing, was it ever provided

6  orally to you?

7      A.   Permission to use the characters?

8      Q.   Yes.

9      A.   Yes.  I mean, you would just

10 check to make sure, Can I use this

11 character.

12              Like I say, the only real

13 restrictions were continuity.  It wasn't

14 like this character is forbidden, nobody

15 could write it.  You didn't want to

16 conflict with what another writer was doing

17 on another title.

18      Q.   Right.  Okay.

19              Did you -- were you ever in

20 a situation where you submitted material

21 and you were told that you were in jeopardy

22 of being sued by DC Comics because you had

23 used their copyrighted material in your

24 unsolicited submission?

25      A.   No, nothing like that ever



1  happened.

2      Q.   Were you aware of that ever

3  happening to other freelance contributors?

4      A.   I had never heard of that

5  happening.

6      Q.   Okay.  Was it your understanding

7  that each editor was at liberty to consider

8  unsolicited materials from freelance

9  contributors?

10     A.   Yeah.  I mean, you can walk in

11 off the street and pitch something.

12     Q.   Did that ever happen?

13     A.   Oh, yeah.  It happened all the

14 time.  I never pitched for Batman because I

15 never thought I'd ever get it.  That was

16 the dream assignment in comics.

17              But, yes.  I pitched lots of

18 other things.  I was always at DC, throwing

19 ideas at them before they hired me and

20 after they hired me.

21     Q.   How did you throw ideas at them?

22     A.   You might show up with like a

23 pitch piece, like a treatment, like a four

24 or five-page thing.  Or you might just

25 pitch it verbally in their office; what if



Page 12

1  this happened what if we did this.  Just

2  simple you know, very casual atmosphere.

3      Q.   When you did a pitch piece, would

4  you write down sort of the idea of the

5  story?  Was there text you work from when

6  you did a pitch piece?

7      A.   No.  You just sort of wrote a

8  general summary of what the story would be

9  about and how many issues you think it

10  would take to tell.

11      Q.   And would you use -- would you

12  use a DC character in that pitch piece?

13      A.   Absolutely.  If you were pitching

14  to DC, there's DC characters.

15      Q.   Okay.  All right.  And when you

16  didn't a pitch piece, you submitted it to

17  an editor.  What was the next step?

18      A.   You'd wait till they read it.

19  Sometimes they'd read it right there in

20  front of you, if you handed it to them in

21  person.

22          Generally, I would email.

23  Back in the day, fax pitches.  And you just

24  wait to hear back.  It would either be yes

25  or no, or let's talk about it, or maybe we



Page 13

1    can use this later, or maybe if you, if it

2    was four issues instead of six, all those

3    kind of considerations.

4         Q.   But it was your understanding

5    that you had permission to use DC

6    characters in your pitch pieces, correct?

7         A.   Yes.  They were wide open ideas,

8    they would sometimes say, you know, could

9    you pitch this character, we're looking for

10   something for this character or that

11   character a lot of times.

12                 The structure at DC was that

13   all of the characters were broken up and

14   controlled by different editors.  So you

15   had to find out which editor was

16   controlling the character you were

17   interested in.  And just simply pitch to

18   them either verbally or in print.

19        Q.   Okay.  Were you aware of any

20   other freelance writers pitching to editors

21   of DC Comics material that incorporated

22   DC Comics characters, and specifically

23   Batman characters?

24        A.   Everybody was pitching all the

25   time.  Like I said, everybody pitched



Page 14

1  Batman, because you want to get on to

2  Batman.  It was the title to work on.

3              So, you know, I visit DC and

4  there'd always be a half of dozen other

5  freelancers there and they were there to

6  pitch.

7      Q.   When you say everyone in these

8  other freelancers, are you referring to

9  people that are in the inner circle, or are

10  you referring to people who are not in the

11  inner Batman circle that?

12      A.   Well, in the DC offices it was

13  generally people who were already working

14  for DC.  But, you know, lots of times I saw

15  freelancers pitching at conventions.  Come

16  to a DC booth and say, Hey, I have an idea.

17      Q.   Okay.  When you say "people,"

18  when you refer to people in the office that

19  were already working on things, what do you

20  mean by that?

21      A.   Well, these were people that they

22  had monthly books.  They had monthly

23  assignments.  Generally it was like

24  Wednesdays.  The freelancers would show up.

25  It would be freelancer day at DC.  You'd go



```
 1   and your editor would take you to lunch.
 2                   So you get a free lunch and
 3   you get to pitch ideas.  And it was,
 4   you know, it was usually the usual
 5   suspects.  It was guys who already had
 6   assignments with the company.  But
 7   sometimes not.
 8                   And sometimes -- I mean,
 9   once, I even brought along a friend of mine
10   who was a newspaper reporter and he pitched
11   an idea.  I just brought him along as a
12   guest.
13       Q.   And just to clarify, when you
14   were referring to pitching ideas are you
15   referring to just ideas for stories or did
16   you ever witness people pitching, providing
17   art work as opposed to literary work but
18   visual work.
19       A.   Oh, yeah.  A lot of times when
20   you pitched, you have what you call
21   pitch piece.  It would be a piece of
22   artwork.
23                   Because every time I
24   pitched, I had an artist in mind, and I
25   would talk to them beforehand.  And we
```



Page 16

1  would have art prepared to go along with

2  the piece.  So, basically, pitch as

3  a team.  Not all the time.

4             Sometimes I just pitched as

5  a writer, but sometimes I pitched as part

6  of the writer artist team.

7      Q.   And when you're doing these

8  pitches and when they involve a text, can

9  you describe how long the text was?

10     A.   Well, it was generally as long as

11  you needed to tell the story to sell it.

12  You had to sell it and tell it.  Some

13  pitches were short, particularly if they

14  were high concepts.

15             Others were longer if the

16  story was more involved.  It wasn't like a

17  set length for pitch pieces.  It was

18  whatever length you thought you needed in

19  order to sell the story and tell the story.

20     Q.   In order to sell and tell the

21  story, what kind of specific description

22  might you include in your pitch piece?

23     A.   Well, you start with the general

24  overall concept of the story.  Why is this

25  story different from all the other stories,



1    that have been done with this particular

2    character?  And then the direction you want

3    to take it in, and you would simply tell

4    the story beat by beat, including all of

5    the characters involved and everything

6    else.

7                So basically you're giving

8    them the beginning, middle and end of the

9    story, so they understand why this is a

10   different kind of story, why they might

11   want to buy it.  Why it's right for the

12   character.

13       Q.   And when you refer to this sort

14   of phrase beat by beat, what do you mean

15   there?

16       A.   It's like each story scene.

17   Story begins here, goes there, introduce

18   your first major conflict, your twist, your

19   turns, your reveals and your big

20   conclusion.

21       Q.   And was it your understanding

22   that you, that some of the Batman

23   characters you used in these pitches were

24   owned by DC Comics?

25       A.   Yes.  DC owned everything.  You



Page 18

1   were playing in their sand box, but they

2   owned the sand box.

3       Q.   Right.  But it was your

4   understanding you had permission to use the

5   characters in your pitches, correct?

6       A.   Not only permission, you were

7   encouraged.  They didn't want to hear

8   about -- they didn't want you pitching

9   somebody else's characters.  They want the

10  stories to be specific to these characters.

11              So you had to use those

12  characters in the pitch, or otherwise

13  there's no sense in pitching it.

14      Q.   Okay.  And Mr. Dixon, I have

15  looked at your resume and you've got quite

16  a fan page on the internet, fan presence on

17  the internet.

18              So I would say that you were

19  probably very, very welcomed by DC Comics

20  to pitch material.  And so I can understand

21  why you would make this commission and

22  encouragement and apply it to you.

23              Do you think it applied, or

24  was it your impression that this

25  permission, and encouragement applied to



Page 19

1    other freelance writers who didn't have

2    your --

3              MR. WEINBERGER:  Objection.

4    BY MR. PARKER:

5        Q.    You can answer the question,

6    Mr. Dixon.

7        A.    Okay, yeah.  I mean, I didn't

8    have special permission to do this.

9    Anybody could.

10               If you had a good idea for

11   Batman, Superman, Green Lantern or

12   whatever, you could be a total stranger.

13   You can come in off the street and they

14   would be willing to listen, as long as it's

15   a good idea.

16       Q.    And when you were working as a

17   freelance contributor to DC Comics during

18   the early 90s, did you know Christopher

19   Wozniak at that time?

20       A.    Yeah.  I ran across him a couple

21   of times.  I can't remember where or when,

22   but I knew who he was.

23       Q.    Did you know him to be a

24   freelance contributor at the time to

25   DC Comics?

