O1IRWOZo

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

CHRISTOPHER WOZNIAK,

             Plaintiff,

         v.                                    22-cv-8969 (PAE)

WARNER BROTHERS, DC COMICS,

             Defendants.

------------------------------x

                             New York, N.Y.
                             January 18, 2024
                             2:00 p.m.

Before:

               HON. PAUL A. ENGELMAYER,

                             District Judge

                    APPEARANCES

LAW OFFICE OF R. TERRY PARKER
    Attorneys for Plaintiff and Third-Party Defendant
BY:  R. TERRY PARKER

FROSS ZELNICK LEHRMAN & ZISSU PC
    Attorneys for Defendant and Third-Party Plaintiff
BY:  JAMES D. WEINBERGER
    ANDREW NIETES

O1IRWOZo

<table>
<tr><td>1</td><td>(Case called)</td></tr>
<tr><td>2</td><td>MR. PARKER:  Good morning, your Honor.  Terry Parker</td></tr>
<tr><td>3</td><td>for the plaintiff and third-party defendant Christopher</td></tr>
<tr><td>4</td><td>Wozniak.</td></tr>
<tr><td>5</td><td>THE COURT:  Very good.  Good afternoon, Mr. Parker.</td></tr>
<tr><td>6</td><td>MR. WEINBERGER:  James Weinberger, Fross Zelnick</td></tr>
<tr><td>7</td><td>Lehrman & Zissu, for defendant Warner Brothers Entertainment</td></tr>
<tr><td>8</td><td>and counterclaim plaintiff DC Comics.</td></tr>
<tr><td>9</td><td>MR. NIETES:  Andrew Nietes of Fross Zelnick as well</td></tr>
<tr><td>10</td><td>for defendant Warner Brothers, Inc., and counterclaimant DC</td></tr>
<tr><td>11</td><td>Comics.</td></tr>
<tr><td>12</td><td>THE COURT:  All right.  Very good.  Good afternoon to</td></tr>
<tr><td>13</td><td>you, and good afternoon to the others who are here today,</td></tr>
<tr><td>14</td><td>including our court reporter.</td></tr>
<tr><td>15</td><td>All right.  We're about to have a summary judgment</td></tr>
<tr><td>16</td><td>argument on the defendants' motions for summary judgment both</td></tr>
<tr><td>17</td><td>on the plaintiff's claim as well as on the third party and</td></tr>
<tr><td>18</td><td>counterclaims.  So I'll begin with you, Mr. Weinberger, but</td></tr>
<tr><td>19</td><td>before we get into the argument, one thing I wasn't factually</td></tr>
<tr><td>20</td><td>clear about is just what discovery consisted of in this case.</td></tr>
<tr><td>21</td><td>Can you just summarize what it consisted of?</td></tr>
<tr><td>22</td><td>MR. WEINBERGER:  Well, the discovery of the plaintiff</td></tr>
<tr><td>23</td><td>consisted of copies of the story that he claims was infringed</td></tr>
<tr><td>24</td><td>that we were -- that he was able to get.  We took his</td></tr>
<tr><td>25</td><td>deposition.  There were some other materials.  He had</td></tr>
</table>

O1IRWOZo

1  correspondence largely about the claim that he was bringing and

2  people he had talked to about it.  Discovery of our clients

3  included basically access to an exemplary collection of Batman

4  works, much like the material that we've put in our motion

5  today, with an invitation to the plaintiff to ask for more if

6  there were more things that he wanted to see.

7      We provided him with a number of agreements, both

8  relating to the underlying——I don't want to say the acquisition

9  of rights by DC Comics because Batman was owned by DC Comics at

10  inception as a work made for hire——but the underlying

11  agreements with the creators, a number of other agreements,

12  both relating to the development of the character over the

13  years, the license to Warner Brothers for production of films,

14  the agreements with the various writers and directors -- well,

15  sorry, writer agreements related to the film, and any

16  correspondence that related to Mr. Wozniak or his claim that we

17  were able to find.

18      THE COURT:  Were there any depositions, or what if any

19  depositions were taken of defense side personnel?

20      MR. WEINBERGER:  Sorry.  So the former publisher and

21  President of DC Comics, Mr. Levitz was deposed.  Mr. Kogan, who

22  is the chief -- head legal officer at DC Comics, was deposed.

23  A 30(b)(6) representative of Warner Brothers was deposed.

24  Mr. Reeves, the writer and director of the Batman film, was

25  deposed.  Terry, I don't know if I'm leaving anyone out.  A

O1IRWOZo

| 1 | cowriter -- excuse me -- Mr. Tomlin, one of the cowriters of |
| 2 | the script. |
| 3 | THE COURT:  Okay.  If either of you thinks of anyone |
| 4 | else, I would welcome knowing that.  And by the way, |
| 5 | Mr. Parker, when the time comes for you to speak, you'll need |
| 6 | to just have the microphone closer to you.  Very good.  That is |
| 7 | helpful and helps set the scene for me. |
| 8 | With that, Mr. Weinberger, the floor is yours. |
| 9 | MR. WEINBERGER:  Do you want me at the podium? |
| 10 | THE COURT:  As long as you are speaking into the mic, |
| 11 | either is fine. |
| 12 | MR. WEINBERGER:  Thank you.  We appreciate the |
| 13 | opportunity to be heard today.  I want to run through a couple |
| 14 | of high-level points.  Our motion is set in our brief.  We feel |
| 15 | that the materials that we submitted speak for themselves.  But |
| 16 | as a preliminary matter, I think the first point I want to make |
| 17 | is that the Wozniak declaration that was attached to the |
| 18 | opposition to summary judgment was not, from what we can tell, |
| 19 | signed by the plaintiff, and we noted this in our reply brief. |
| 20 | As a result, any reference to it is improper.  There's a |
| 21 | Southern District case, *Star Industries v. A&J Construction*, |
| 22 | that we cited in our brief.  From our perspective the affidavit |
| 23 | is inadmissible because it hasn't been signed. |
| 24 | Moving on to the substance of our claim or of our |
| 25 | motion, from our perspective, the Court need only find that DC |

O1IRWOZo

Comics owns Batman, and this dictates entering summary judgment
in favor of our clients on both of the claims in the case.
There's uncontroverted evidence in the record, much of it
stipulated to by the plaintiff, that two individuals, Bob Kane
and Bill Finger, created Batman in the late 1930s.  These were
guys who worked for DC Comics, so DC Comics owned those works
as a work made for hire even though they were paid specially
for it because it was a successful title.

          As explained in the declaration of Mr. Levitz, who is,
I think, the foremost living expert on experience -- sorry.  He
has expertise but also as a lay witness who was present for all
of these events at least after the mid 1970s.  Batman has been
exploited in thousands of comic books, TV shows and films, and
we've provided the Court with materials showing that Exhibit A
of the Levitz declaration is this book, the "80 Years of
Batman" book.  It contains kind of seminal comics, the original
Batman story, the first appearance of the Riddler, the
appearance of other core elements as he has developed over
time.  So you see not only in this book the original Batman but
how his appearance and traits evolved in the 80 years of which
he has been in comics.

          The Daniels' book, which is Levitz Exhibit, really
it's very rare that I go into court and I get to point an
historical document, a 20-plus-year-old book, that talks about
the history of the character that we're trying to protect.  And

O1IRWOZo

1    that's what this book does.  And there are other comics that

2    are reproduced here including the famous origin story of

3    Batman, or of young Bruce Wayne, witnessing his parents' murder

4    in an alley and developing the inspiration to become Batman

5    later in life.

6         We've given you copies of the TV show from the 1960s;

7    another version of Batman that is really different from the

8    comics, more of a campy, cartoonish even though it was

9    live-action-type version.  And then some of the later films,

10   only one of which we're relying on here, because Mr. Wozniak's

11   alleged work was purported to be created in 1990.  So only the

12   Jack Nicholson film is relevant, but there's another example,

13   and we've provided this to the Court of a different way that

14   Batman can be portrayed and more nuanced kind of secondary

15   characters.  So all of that is in the record, as is the chain

16   of title.

17        The plaintiff has raised a concern that not all of the

18   copyright certificates referenced the plaintiff and the

19   counterclaim plaintiff, DC Comics.  But Mr. Kogan's declaration

20   and our explanation in the brief makes clear that DC Comics is

21   the ultimate owner of all of these works, and all of the other

22   entities who are identified in the copyright registrations are

23   basically predecessor entities.  And there's nothing in the

24   record to indicate otherwise.

25        THE COURT:  Let me just pause and ask you something,

O1IRWOZo

| | |
|---|---|
| 1 | and I know this came up in an earlier conference but just to |
| 2 | nail down the point.  I think we discussed, I think it was the |
| 3 | premotion conference but perhaps as far back as the initial |
| 4 | conference, the idea of owning a character.  And I think you |
| 5 | are saying that it is possible for a copyright to adhere just |
| 6 | in a character without more if it's sufficiently delineated. |
| 7 | Would that mean that, for example, if I marketed a bicycle or a |
| 8 | car and called it the Batmobile, even if it bore no resemblance |
| 9 | to the Batmobile or something like that or, you know, called a |
| 10 | doll Batman even if it bore no resemblance to the Batman, as we |
| 11 | understand him, that that simply by using that name would be |
| 12 | protectable under copyright? |
| 13 | MR. WEINBERGER:  Not under copyright, no, but under |
| 14 | trademark it would be.  For example, in the example of the |
| 15 | bicycle, a bicycle called the Batmobile with no other indicia |
| 16 | emanating from the Batman copyrighted works, it would be |
| 17 | difficult to characterize that as a copyright infringement. |
| 18 | There would have to be trademarks for those terms, and so there |
| 19 | would be another avenue of relief.  But I was just about to get |
| 20 | to how that works. |
| 21 | THE COURT:  Go ahead.  I want to come back to it, but |
| 22 | if you are about to go there, keep on. |
| 23 | MR. WEINBERGER:  Sure.  The question of character |
| 24 | protection under copyright law, basically protection of |
| 25 | works -- of elements from expressive works independent of the |

O1IRWOZo

```
 1    works in which they appear.  So not just the story, but you
 2    take the people or the places, the fictional places, out of the
 3    story, the protection for those kinds of elements at that level
 4    has existed for decades.  And there are two relatively recent
 5    cases in this district that go through all the ways in which
 6    that can happen.  But basically, the two *Colting* cases, the
 7    *Salinger* case involving "Catcher in the Rye" and the *Penguin*
 8    *Random House* case, which is Judge Rakoff's decision from a few
 9    years ago, that involves the characters from the novels
10    "Breakfast at Tiffany's," from the Hemingway novel "The Old Man
11    and the Sea," from "On the Road" and from "2001: A Space
12    Odyssey," all make clear that if the characters were
13    sufficiently delineated so that basically you can tell who they
14    are when you see them in another context, that they can be
15    detectable independently.  And we think that given the material
16    we have provided the Court, all of which has not been
17    controverted in the record, the substantive material, that you
18    can make that determination.
19          THE COURT:  If so, the notion would be Batman is
20    certainly well delineated.  Would that mean that literally any
21    writing that somebody engaged in that used Batman and that
22    picked up on that delineation in some way was protected in
23    copyright?
24          MR. WEINBERGER:  Well, I would say that it would be an
25    infringement to write a Batman story or to create——a technical
```

O1IRWOZo

1    infringement——a Batman comic book without authorization of my

2    client.  Is there a world where if I --

3          THE COURT:  Sure, but if I wrote a novel, you know,

4    which in a few pages made reference to Batman crossing the

5    field of vision, having some encounter with somebody, something

6    like that; I mean, because I'm drawing on your client's

7    familiar Batman, am I infringing his copyright?

8          MR. WEINBERGER:  I think it would depend on the

9    context.  What I was about to say is if you wrote a novel and

10    one of the protagonists picked up a Batman comic and the novel

11    talks about the character's interaction with the comic book,

12    you know, I think that's one example that would be likely not

13    be one --

14          THE COURT:  That would be fair use.

15          MR. WEINBERGER:  I was going to say that would be fair

16    use.  Is there a world in which some de minimis use of

17    Batman in some greater work might be fair use or not

18    infringing?  I suppose that's possible, but that's not this

19    case.

20          THE COURT:  In other words, to the extent that you are

21    making the argument that the character per se is copyrightable,

22    you need to defend that proposition only in the context of a

23    work that is built around that character.

24          MR. WEINBERGER:  That's right.  That's right, your

25    Honor.

O1IRWOZo

1          So as I was saying, we believe that based on the

2     material we've provided and the case law regarding characters,

3     that the determination is fairly straightforward.  But the

4     Court really doesn't have to do that if it chooses not to.

5     We've got four cases in this circuit, one by the Second Circuit

6     in 1982, the *DC v. Reel Fantasy* case, and that's 695 F.2d 24.

7     And then the decisions of other Southern District judges, Judge

8     Pauley in *Sapon*, Judge Mukasey in the *Bobtron* case from 1990,

9     and I mean, the *Fox Publications* decision from 1942.  This was

10    only three years after Batman debuted.  There probably were a

11    couple dozen comic books when that decision was reached, let

12    alone the thousands that have appeared since then, the film,

13    television, et cetera.  So from our perspective, I don't know

14    that it's binding precedent, but this question has been

15    answered over and over again by courts in this circuit in the

16    affirmative.

17          And Mr. Wozniak knows this, and he knew it in 1991

18    when he signed a contract that said so much.  He was a

19    freelance artist at DC Comics.  He inked Batman comics,

20    penciled -- inking and penciling are two different techniques

21    by which art was put in comic books.  That was Mr. Wozniak's

22    chief work at DC Comics as a freelancer.  And in order to get

23    paid, he had to sign a contract that acknowledged that DC owned

24    rights in Batman and the characters and the settings and the

25    scenes that were portrayed in the drawings that he was doing

O1IRWOZo

```
1    and that he wouldn't lay claim to ownership.  And he did

2    that -- we have two examples in the record, the Kogan

3    declaration Exhibits M and N.  He knew this.  He knew it at the

4    time, so this really shouldn't be, from our perspective, a

5    question of any controversy.  And as a result, this dictates

6    summary judgment on both of the substantive claims in the case.

7              THE COURT:  Sorry, both of the substantive claims?

8              MR. WEINBERGER:  The defense claim, meaning, the

9    defense of Warner Brothers, and the affirmative infringement

10   claim by DC Comics.  I should have said --

11             THE COURT:  But there's a separate claim involving the

12   registration.

13             MR. WEINBERGER:  Correct.  I think it's determinative

14   of the fraud claim as well.  I should have said three claims.

15             THE COURT:  Okay.  But the proposition you just had, I

16   took to refer to the two infringement claims.

17             MR. WEINBERGER:  That's correct.

18             So in order to prevail on his claim against Warner

19   Brothers, right, his claim that his story is infringed by the

20   film "The Batman," Mr. Wozniak was required to prove that he

21   owned a valid copyright in that story.  And the case law

22   regarding infringement and ownership is very clear—not just

23   the case law, the statute.  Section 103(b) of the Copyright Act

24   is clear.  Well, 103(a) says that no copyright ownership can

25   extend to any preexisting material in which the material was
```

O1IRWOZo

1    used unlawfully.  So from our perspective at the first stage,

2    the fact that the underlying work was based on preexisting

3    material and attempted to be exploited by Mr. Wozniak in a way

4    that he did not have a right to do and signed a contract that

5    said he wouldn't do, renders the entire work unlawful.

6            THE COURT:  In other words, the fact that his story is

7    from your point of view an infringement of "The

8    Batman" copyright or of DC Comics' copyright means that story

9    or any story that Mr. Wozniak would write about Batman is

10   necessarily an act of infringement and therefore can't be the

11   fulcrum on which an affirmative copyright claim is based.

12           MR. WEINBERGER:  Yes.  That's what Section 103(a)of

13   the Copyright Act says.

14           THE COURT:  It says "unlawful."  Is unlawful defined?

15           MR. WEINBERGER:  I believe it means infringement --

16   infringing.

17           THE COURT:  So what this shows is that to the extent

18   that -- that basically makes the two claims collapse

19   essentially.

20           MR. WEINBERGER:  Yes.

21           THE COURT:  If you prove up your affirmative claim of

22   infringement, it follows that Mr. Wozniak's affirmative claim

23   can't stand.

24           MR. WEINBERGER:  That's correct, Judge.  That's

25   correct.

O1IRWOZo

1          But even if the material was not used unlawfully,

2    103(b) is clear that copyright in a new work that is based on

3    or utilized preexisting work cannot extend protection to the

4    underlying material, and the reason for this is very

5    straightforward.  Copyright is for a limited term.  It's set

6    forth in the constitution that it's for a limited term.  And if

7    you could write a sequel and extend protection from the

8    underlying work to the new work, you would basically be

9    advancing the date by which copyright protection subsisted and

10   theoretically advancing the length of protection, which courts

11   have held cannot be.  So never, even if the material is used

12   with permission, if I got permission from DC Comics to do a new

13   Batman story, it wouldn't give me copyright rights in anything

14   that was in existence at the time.

15          THE COURT:  So when does the Batman copyright expire?

16          MR. WEINBERGER:  I believe 2033, the original comic,

17   the original comic, the first comic.

18          THE COURT:  Do the math.  How does that play out?

19          MR. WEINBERGER:  Well, I'm not going to get my dates

20   right because 1909 Act dates work differently than 1978.

21          THE COURT:  Right.

22          MR. WEINBERGER:  It's less complicated but at some

23   point in the next I think it's 11 or 12 years, the copyright in

24   the original——the first Batman comic——will expire.

25          THE COURT:  Okay.  And successive works let's say by

O1IRWOZo

1    DC Comics --

2              MR. WEINBERGER:  Every year.

3              THE COURT:  Every year.

4              What about the concept of "The Batman" though?  "The

5    Batman," if you will, I think you are saying, has been

6    sufficiently delineated since the 1930s; does that mean that

7    your copyright in that concept similarly would expire in the

8    next several years?

9              MR. WEINBERGER:  Well, it's not the concept per se.

10   It's the expressive traits and elements that have been -- in

11   which pen has been put to paper as it's been developed over

12   time.  Honestly, I'm not sure I could really answer that

13   question.  Personally, I think that it would become less

14   protectable over time, but that's not an issue that we're

15   dealing with in this case.

16             THE COURT:  Right.  I mean, to the extent that the

17   copyright in the original Batman would expire with

18   hypothetically the first expiration of a Batman-based work, and

19   that's just a hypothetical, that date hasn't hit yet?

20             MR. WEINBERGER:  Correct.

21             THE COURT:  Okay.  Go ahead.

22             MR. WEINBERGER:  So the point I was making was that

23   whether you determine that the Wozniak story is infringing or

24   not, either way, it cannot give him rights to Batman material

25   that predated his story.  It cannot as a matter of statutory

O1IRWOZo

1   language.

2            THE COURT:  So let me ask you this.  Just indulge a

3   hypothetical that is an extreme version of what he is claiming

4   happened here.  Yes, he has a working relationship with Warner

5   Brothers -- with DC Comics, I guess.  Let's suppose he came up

6   with just a killer, great, new Batman story but based on Batman

7   and turned it into Warner Brothers, DC Comics, the two of them

8   together, and then in a shameless, you know, ripoff, Warner

9   Brothers then built a film that was all but verbatim based on

10  what Mr. Wozniak did.

11           From your perspective, I think you are saying to me

12  that he is out of luck because he is ultimately exploiting a

13  protected character that he has no intellectual property rights

14  in and that your client, DC Comics, does.  And therefore, law

15  of the jungle, your client gets to make complete use of

16  verbatim of what Mr. Wozniak did.  Can that really be so?  I

17  mean, that's logically what you're saying.

18           MR. WEINBERGER:  I don't think we're saying anything

19  that extreme.

20           THE COURT:  No, no.  You haven't articulated it, but

21  it largely follows from your disqualification theory that if he

22  is building a story around a character that somebody else owns

23  and he doesn't, he is out of luck from the jump.

24           MR. WEINBERGER:  So I think that is there a world in

25  which a writer can prepare a script for a film that

O1IRWOZo

1    incorporates protectable characters owned by somebody else, and

2    then without prior contracts being signed, where

3    acknowledgments were made, where the use of the ultimate script

4    is slavish, and most importantly, where you could parse out,

5    basically remove, the underlying copyrightable elements that DC

6    owns from that script and have it still maintain some

7    copyrightable expression, I think there is a world, if access

8    is proven and you could show similarity, where a plaintiff in

9    that situation might theoretically have a claim.  This is not

10   that case.

11          THE COURT:  I understand.

12          MR. WEINBERGER:  I don't mean to suggest that it

13   cannot exist.

14          THE COURT:  All right.  But the way in which you put

15   the theory certainly lent itself to that.  You're now

16   qualifying it.  The way you had articulated it would have said,

17   in effect, if you are building a story around our Batman, you

18   can never claim infringement based on somebody else's use of

19   that story.

20          MR. WEINBERGER:  Well, I don't know that we've ever

21   said never.  I do think that in this particular case, we've got

22   a plaintiff who created a work that was not solicited.  It was

23   not requested.  He brought it to somebody.

24          THE COURT:  Whether solicited or not, suppose he in an

25   unsolicited way gave you a fabulous Batman story, and your

O1IRWOZo

```
1    client proceeded to then publish it and build a movie closely

2    around it.  Solicited or not, I take it you are backing away

3    from the theory that there would be automatically no

4    possibility of a viable copyright infringement claim?

5         MR. WEINBERGER:  I don't know that I could answer the

6    question that -- again, I don't think there's a world where no

7    way that could ever be a claim.  Again, if you could take a

8    script and remove all of the Batman elements from it and still

9    have the work be freestanding, which is a fact-sensitive

10   exercise, in theory, I think such a claim could exist.  I just

11   don't think it does.

12        THE COURT:  Is there any case law that supports the

13   exercise you are proposing would have to be done, which is to

14   say, you extract the component of the new story that is

15   protectable, for example, the delineated Batman character, and

16   then look to see whether the residue itself is infringing?  I

17   mean, there's a logic to what you're saying, but does that come

18   from the case law?

19        MR. WEINBERGER:  All of the cases say that

20   effectively, that that is what you are required to do a

21   copyright infringement analysis.  When you look at the

22   plaintiff's work and compare it to the defendant's work, you

23   must remove from that analysis preexisting material,

24   unprotectable material and ideas and conduct your analysis with

25   that filtration.
```

O1IRWOZo

1    THE COURT: So if we remove the Batman character and

2  perhaps even with it some Batman scenes, but there's some other

3  scene. There's a love scene between two other people that is

4  copied by your client hypothetically. Mr. Wozniak in that

5  circumstance would be able to claim copyright infringement

6  because in effect something that is not tainted by the

7  Batman ownership has been copied.

8    MR. WEINBERGER: In theory, yes. And in this case, we

9  actually have that in a roundabout way. When I deposed

10  Mr. Wozniak, I asked him some questions about whether he felt

11  he could publish this story, the story that is the allegedly

12  infringed story, without the permission of DC Comics. And in

13  answering that question, he revealed that, in fact, he had

14  taken the story to another publisher, not DC Comics, during the

15  course of his attempting to get it published. And I asked him,

16  I said, well, what did you do? Did you bring them a Batman

17  story that DC Comics hadn't approved? He said, oh, no, I took

18  Batman and all of the Batman elements out, and I created

19  basically a clean -- I don't want to use the word clean.

20  That's not fair, but he created a non-Batman version of the

21  story. He inserted a character -- one of the characters owned

22  by the publisher. He was pitching to a character named

23  ShadowHawk, and I think his testimony is that the remainder of

24  the names, he just made up names of people who didn't exist.

25    THE COURT: Is there in the record of a copy of what

O1IRWOZo

1    he gave to the other publisher?

2            MR. WEINBERGER:  Yes.  This is Exhibit G to my

3    declaration.

4            THE COURT:  You are not contending that they are

5    infringing because they get rid of Batman, correct?

6            MR. WEINBERGER:  That's correct.

7            THE COURT:  Because in effect from your perspective,

8    in what you regard as admission by the plaintiff, his

9    extricating the Batman component reflects his awareness of what

10   the ground rules were.

11           MR. WEINBERGER:  That's right.  And this version of

12   the story——we call it the ShadowHawk version because that's the

13   character he put in Batman 's place, which, again, is in the

14   record at Exhibit G——it's actually a very useful tool for the

15   Court.  The exercise of unseeing what you've seen in the

16   filtration process that the Court has to undertake in doing the

17   infringement analysis is very difficult conceptually, but

18   Mr. Wozniak has done this already.  It's sitting there in the

19   record.  We have a version of this story without Batman.

20           Now, that's not necessarily the only thing that has to

21   be done.  You still are required -- the Court is still required

22   to filter out other unprotectable elements or ideas from the

23   script when doing the analysis.  But we think the proper point

24   of comparison in the case is the ShadowHawk version against the

25   film.

O1IRWOZo

1    THE COURT:  Because the ShadowHawk version from your

2    perspective is actually faithful to the law of copyright?

3    MR. WEINBERGER:  It is -- well, I can't speak what

4    it's faithful to, but it doesn't include any Batman elements.

5    THE COURT:  It's not infringing your rights even if

6    it's violating somebody else's.

7    MR. WEINBERGER:  That's correct.  I know Mr. Wozniak

8    has not claimed that this version of the story is infringed.

9    That's not one of the claims in the case, so I'm not suggesting

10   that that is the claim.  But it's the tool to conduct the

11   analysis between the story and the film.

12   THE COURT:  Each of you, in claiming infringement, is

13   seizing on the Batman elements as opposed to the exogenous

14   storyline?

15   MR. WEINBERGER:  That's right.  That's right.  In

16   fact, that's one of Mr. Wozniak's defenses to the DC

17   infringement claim is that his story doesn't copy any

18   particular DC story.  But that's beside the point.

19   THE COURT:  Let me come to your affirmative copyright

20   infringement claim.  I understand the theory that your client,

21   DC Comics owns the Batman figure and some of the associated

22   features of the narrative and that the story, as allegedly

23   prepared in 1990, infringes that.

24   Suppose that Mr. Wozniak just held on to that in his

25   own home, having written up the story, as opposed to presenting

O1IRWOZo

```
1   it to DC Comics affiliate or partner Warner Brothers.  Suppose
2   he did that.  Would there be a completed act of copyright
3   infringement if he just kept it in his own living room?
4              MR. WEINBERGER:  This is a complicated question, and
5   it doesn't just apply to my client, it applies to everybody.
6   In the days before we had digital music, we all made mixtapes
7   off of records and CDs and created them for ourselves.
8              THE COURT:  Well, there's a statute of limitations
9   that protects you on what you just said.
10             MR. WEINBERGER:  Yes, I think so, an age-related
11  statute.
12             The act of creating a copy of something is,
13  technically speaking, an infringement.  But a practice has
14  developed, for example, among the record industry, not to sue
15  people for making copies of things in their homes whether it's
16  because of fair use, whether it's de minimis, or whatever
17  reason it is, such that I don't believe there's any case that
18  stands for the proposition that a record company that sues an
19  illegal downloader years later could be hurt by the fact that
20  that person might have made an illegal copy in their home 20
21  years before.
22             THE COURT:  And this is why ASCAP doesn't go after
23  people humming on the street.
24             MR. WEINBERGER:  That's right.  And also because it's
25  wildly impractical.  My client as set forth in the declarations
```

O1IRWOZo

```
1   that we've submitted, DC has a policy.  Not only does it not
2   use fans who sit at home and do this sort of thing, otherwise,
3   my sons, when young, would have been infringers for doing
4   drawings.  But my client generally does not enforce against
5   people who are not exploiting the properties commercially.
6   That's their demarcation point.
7           THE COURT:  But as a matter of law, it's not
8   necessary, from your perspective, that Mr. Wozniak offered, if
9   you will, his work -- well, what's the point at which what
10  Mr. Wozniak does becomes copyright infringement from your
11  perspective?
12          MR. WEINBERGER:  I think if you are looking at it
13  purely technically without any regard to industry or practice,
14  the act of creating the story was infringement.  But the
15  context was important, right.  He was creating it as somebody
16  who spent time at DC Comics.  Whether or not he received
17  specific authorization, he felt that he had authorization to
18  create it.  And certainly when it was given to DC for
19  consideration, the response wasn't you are an infringer, stop.
20  It was, you know what, we don't want to use this.
21          THE COURT:  All right.  So it's 1990 that he develops
22  the story, and when is it that he says he brought it for
23  consideration?
24          MR. WEINBERGER:  Around that time.
25          THE COURT:  Why isn't this time-barred?
```

O1IRWOZo

```
1        MR. WEINBERGER:  Because at that point——and he

2   testified to this effect——he didn't think he had any rights to

3   publish it without DC's permission.  The act of creating a

4   story and being told no, and then you go home and put it in

5   your drawer.  It's commercially irrelevant to my client.  If

6   that was an act of infringement that obligated my client to

7   sue, my client would be in the lawsuit business, not the comic

8   book business, because this sort of thing in theory happens all

9   the time.

10       THE COURT:  Right.  And I appreciate your client's

11  restraint and not in 1990 or so taking any action.  The

12  question is what is it that allows your client circa 2020 to

13  claim that an act of copying that occurred around 1990 is

14  actionable?

15       MR. WEINBERGER:  Well, it's 2022, and it's the day

16  that Mr. Wozniak claimed rights in this story, that he could do

17  something with it without DC Comics.  It's effectively his

18  infringement claim is tantamount to an ownership claim that he

19  owns Batman.  Because if he doesn't own Batman, he has nothing

20  to sue over.

21       THE COURT:  Right.  But where I'm going is I fully

22  understand the spirit of your defense against his infringement

23  claim.  The question is if essentially what he's doing is he is

24  claiming ownership not by trying himself at this point to do

25  anything with the story, but rather to get relief from Warner
```

O1IRWOZo

```
1   Brothers, why is it that that makes for a non-time-barred claim
2   of copyright infringement brought by DC Comics?
3            MR. WEINBERGER:  Well, I think it's both my client's
4   expectation and understanding at the time, this was someone who
5   had done work and had signed agreements saying that he
6   wasn't claiming rights to ownership.  So there was simply
7   nothing about his preparation of the story in the hope that it
8   got published, which would trigger some sort of obligation to
9   sue once my client declined effectively publication of its own
10  material, right.  It's its own material, so there was nothing
11  to do at that point.
12           I would say that if Mr. Wozniak, with my client's
13  knowledge, had gone out in 1995 and pitched the Batman story
14  that he wrote to Marvel and my client became aware of it, that
15  would have probably triggered a claim.  And that would have
16  been a problem, but that's not what happened here.
17           THE COURT:  If he had done that in 1995 and whatever
18  the result of that was, fast forward 27 years, and in 2022,
19  uses his ownership of the story as a basis for an affirmative
20  lawsuit against Warner Brothers, you would be saying that's a
21  separate, fresh restarting of the statute, a separate act of
22  infringement?
23           MR. WEINBERGER:  No.  Actually, I was saying the
24  opposite.  I was saying that if Mr. Wozniak had tried to sell
25  the story in a public way with the Batman elements to a third
```

O1IRWOZo

```
1    party, and my client hadn't done anything about it, I could see
2    that as a situation where the statute of limitations about his
3    claim to ownership had run.  Because he would have made a
4    public statement, that my client was aware of, that he owns
5    Batman, but he never did that until 2022.
6              THE COURT:  Right.
7              MR. WEINBERGER:  That's the point.
8              THE COURT:  What is he doing to infringe in 2022?
9              MR. WEINBERGER:  He's seeking to --
10             THE COURT:  I mean, he's not trying to publish his
11    story.  He's trying to stop somebody else from, from his
12    perspective, infringing that story.
13             MR. WEINBERGER:  Without getting into what I view as
14    settlement negotiations, he is trying to extract a monetary --
15    well, he is trying to extract something from what he views as a
16    publication of his story by my client without authorization.
17             THE COURT:  By your client, Warner Brothers?
18             MR. WEINBERGER:  Yes.
19             THE COURT:  And how is that a copyright infringement
20    of DC Comics?  Is it because only DC Comics can -- if Warner
21    Brothers is doing something wrong, only DC Comics can vindicate
22    the right?
23             MR. WEINBERGER:  Correct.
24             THE COURT:  And so, by stepping ahead of DC Comics to
25    try to extract legal relief for infringement of copyright owned
```

O1IRWOZo

 1    only by DC Comics, he's misappropriating --

 2            MR. WEINBERGER:  He's seeking to exercise one of DC's

 3    exclusive rights under Section 106 of the Copyright Act.

 4    That's right.

 5            THE COURT:  Supposing you prevail on this affirmative

 6    copyright infringement claim, you're seeking summary judgment

 7    only on liability.  What happens with damages?

 8            MR. WEINBERGER:  Well, in theory there's a trial.

 9    Whether my client would pursue it, I don't know.  There's a

10    statutory damage election that is available should we choose to

11    elect it, or we could argue for actual damages.

12            THE COURT:  Have you done any discovery on actual

13    damages?

14            MR. WEINBERGER:  It's effectively our attorneys' fees

15    in this case, Judge.

16            THE COURT:  Explain.

17            MR. WEINBERGER:  Well, the harm to my client has been

18    having to defend this claim, so it's effectively our fees.

19    They are not complete yet.

20            THE COURT:  Your harm to?  Sorry, I want to parse

21    which client.

22            MR. WEINBERGER:  Harm to Warner Brothers.

23            THE COURT:  But it is DC Comics.

24            MR. WEINBERGER:  Sorry, harm to DC Comics.  Same

25    difference.

O1IRWOZo

1          THE COURT:  Not necessarily the same difference.  That

2     is the point.  I mean, if you are bringing a damages claim for

3     your affirmative copyright infringement claim, that can't be

4     brought by Warner Brothers.

5          MR. WEINBERGER:  No, I understand, Judge.

6          THE COURT:  You are not defending a claim against DC

7     Comics.  It's a separate entity you're defending here.

8          I don't know if you've even been parsing your fees

9     separately by client, but how is it that your defense of Warner

10    Brothers would be a recoverable species of damages on your

11    affirmative copyright infringement claim based on DC Comics?

12         MR. WEINBERGER:  So I have not looked at this

13    recently, but my memory and my belief——and this is not in the

14    record, so I am speaking off the top of my head——is that

15    there's likely an indemnification obligation because Warner

16    Brothers is the licensee and DC is ultimately responsible for

17    this claim.

18         THE COURT:  All right.  Other than through an

19    indemnification theory, is there anything other than statutory

20    damages that could be available?

21         MR. WEINBERGER:  Not that I can think of off the top

22    of my head, Judge, no.

23         THE COURT:  Okay.  Can we pivot to the registration

24    claim?  What is the relief you are seeking on that claim?  Is

25    it to void the registration?

O1IRWOZo

1           MR. WEINBERGER:  Yes.

2           THE COURT:  Anything else?

3           MR. WEINBERGER:  No.

4           THE COURT:  I was surprised to learn from your brief

5     that to void a registration, apparently fraud needs to be

6     shown; is that correct?

7           MR. WEINBERGER:  There is -- I don't personally agree

8     with it, but there's a recent body of case law, including a

9     Supreme Court case involving fabric designs, that hold that

10    basically mistakes in connection with a procurement of a

11    copyright registration -- you check the wrong box.  You fill

12    out the visual work form when you meant to fill out the

13    literary text form.  Filing for copyright registration can be

14    very complex, and there's a body of case law that has developed

15    that basically says little mistakes on applications don't

16    deprive you of rights.

17          THE COURT:  Sure.  But in the patent world, if I

18    remember right, if you fail to identify important prior art,

19    even if it's done out of complete ignorance and there's no

20    scienter, I think that can result in voiding the patent.  No?

21          MR. WEINBERGER:  I'm not a patent lawyer, but I

22    believe that is right, too.

23          THE COURT:  Why is it different in the context of

24    copyright?

25          MR. WEINBERGER:  Because often the copyright

O1IRWOZo

1    registration, while it does allow you to get into court——you

2    cannot get into court without one——it doesn't carry with it the

3    same evidentiary presumptions and benefits that a patent

4    certificate does.

5         THE COURT:  You are saying there's no presumption

6    because the registration is filed more than five years after

7    the story is created?

8         MR. WEINBERGER:  That's right in this particular case.

9    But the general rule about copyright registrations is while

10   they create a presumption of ownership, they are not as

11   powerful as a patent claim.  The Court will kind of look at

12   works that are registered fresh, the way that a Court that is

13   looking at a patent really has to give some deference to the

14   PTO.  It's not the same kind of substantive determination that

15   the patent office or even the trademark office would give.

16        However, in the event that a registrant goes to the

17   copyright office with a sequel to Star Wars but doesn't

18   disclose that, A, it is in fact a sequel, and, B, it was made

19   without permission, the copyright is not going to register

20   that.  And that's the standard.  The question is whether the

21   copyright office would not have registered the work but for the

22   lack of disclosure and whether the disclosure was intentional.

23        THE COURT:  Okay.  But, look, as to this one, what you

24   are saying was undisclosed is essentially the whole prior

25   history of Batman and this registrant's prior working history

O1IRWOZo

1    with DC Comics, right?

2         MR. WEINBERGER:  That's right.

3         THE COURT:  So how can anybody at the copyright office

4    have not known about Batman?

5         MR. WEINBERGER:  Well, it didn't say Batman in the

6    title.  I believe it was called "The Ultimate Riddle" when he

7    applied for it.

8         THE COURT:  But the content of the story is about

9    Batman, right?

10        MR. WEINBERGER:  Yes, but they --

11        THE COURT:  In other words, you are not suggesting

12   that the neutered version that was called ShadowHawk was what

13   was registered.  It was the Batman version, right?

14        MR. WEINBERGER:  That's right.  I can't speak to what

15   the copyright office does or doesn't do.  There's times when I

16   applied for copyright registration where I expected pushback

17   and have not gotten it and vice versa.  The process of whoever

18   reviews it, that is not something that I am able to speak to.

19   I can tell you that it's inconsistent.

20        THE COURT:  Okay.  Put aside for a moment what makes

21   the nondisclosure here fraudulent as opposed to materially

22   incomplete.  And you are telling me materially incomplete

23   doesn't cut it to void a registration?

24        MR. WEINBERGER:  Correct.

25        THE COURT:  What you are saying makes it materially

O1IRWOZo

```
1    incomplete is leaving out the full -- any reference to the

2    existing copyrights, vis-a-vis Batman, and leaving out his,

3    Mr. Wozniak's, relationship to DC Comics and Batman, correct?

4         MR. WEINBERGER:  Yeah.  Mr. Wozniak is in a different

5    place than most people because of his history as a freelancer,

6    because of the agreements that he signed, and because of his

7    knowledge of the industry.  You know, it may be a recording

8    artist submits a recording of a song that has a small sample in

9    them, but it's something that somebody did at home and they

10   don't know that you need permission to get that sample and use

11   it.  Would that situation be a fraudulent procurement of a

12   copyright registration?  My guess is probably not.

13        Here we have an applicant who had signed agreements

14   saying that he knew that not only that these properties were

15   owned by other people, but that he was not permitted to be

16   filing it.  That's different.

17        THE COURT:  What does he admit that helps support your

18   claim of fraud?  The reason I ask is on summary judgment,

19   fraudulent intent is one of those elements in which a Court has

20   to be hesitant on affirmatively granting summary judgment.

21   It's one thing to grant summary judgment in saying there's not

22   enough evidence on which a finder could find fraud.  It's

23   another thing entirely to say the finder of fact has to find

24   fraudulent intent.  That's not impossible but more of a lift on

25   summary judgment.  So what is it that Mr. Wozniak has admitted
```

O1IRWOZo

1    that from your perspective is checkmate as to his fraudulent

2    intent?

3         MR. WEINBERGER:  Yeah.  I mean, I think, first of all,

4    he admitted that he signed these contracts and they say what

5    they say.  The language --

6         THE COURT:  Back in?

7         MR. WEINBERGER:  1991 and 1992, around the time that

8    the story was created.  But his testimony, I think, speaks for

9    itself.  I know we hear from him today to say, well, how would

10   I know I had to do that?  But every answer he gave at his

11   deposition, all of his communications about what he was trying

12   to do when he wrote this story was write a Batman story.  He

13   testified that he knew.  He knew he couldn't take it to any

14   other publisher unchanged without DC's authorization.  He knew

15   he couldn't do that.  That testimony is cited in our brief and

16   it's attached to my declaration.  And frankly, whatever he is

17   saying now in the face of those admissions and these contracts,

18   I don't think is plausible.

19        THE COURT:  Do we have a copy in the record of his

20   registration?  There was a front piece, if you will, that we

21   have.  It's docket 66-6.  It's this public catalog.  I'm

22   holding it up.  But couldn't find at least what lay beneath,

23   which is the full registration.  Is there more to it than just

24   these handful of words?

25        MR. WEINBERGER:  I think there is a certificate, but I

O1IRWOZo

1   doubt that it says something that is not on that paper.  I will

2   check the record and see if I can find it.

3           THE COURT:  One question would be what the

4   instructions were to Mr. Wozniak at the time.  If all he fills

5   out are these limited things:  Type of work, registration

6   number, application title, description, claimant, date of

7   creation, et cetera, if all he is filling out are these little

8   SAT application form bubble-type things, what is it about the

9   form that essentially notifies him that there's some obligation

10   to supply that type of context you are saying was missing?

11           MR. WEINBERGER:  Because when you file these

12   applications you do so electronically.  You go to the copyright

13   office website, and there are steps that must be taken before

14   you can go to the next screen.  One of the screens is:

15   Identify any material that you are not claiming ownership and

16   explain yourself.  So there's a box to check and a little

17   drop-down window where you can write something if you choose

18   to.

19           THE COURT:  Sorry.  But identifying the material you

20   are not changing ownership, too, but I mean that could be, you

21   know, "Of Mice and Men."

22           MR. WEINBERGER:  Exactly.

23           THE COURT:  No, no.  In other words, it could be

24   things that have nothing to do with Batman.  From his

25   perspective, he is only claiming ownership to the story.  What

O1IRWOZo

1    is it that tells him that would put him on notice that it's

2    fraudulent not to say at the same time, I'm not claiming an

3    interest in the following Batman movies or writings?

4        MR. WEINBERGER:  Honestly, you do not even have to say

5    the following Batman movies.  You can if you choose to, but you

6    must pass a screen that says:  If your work contains

7    preexisting material, identify it by type, text, images, sound

8    recordings.

9        THE COURT:  That's the question.

10        MR. WEINBERGER:  There are boxes to check, and he

11    passed them.

12        THE COURT:  Where are those boxes in the record before

13    me?

14        MR. WEINBERGER:  I'd have to --

15        THE COURT:  Your notion of fraud gets inferred by the

16    questions or prompts that are put to him not by this rather

17    bare bones filing here.

18        MR. WEINBERGER:  I would have to look for the original

19    certificate.  The boxes would be on that certificate if that's

20    what was issued.  If not, there is no record of them because

21    they existed electronically when he filed.

22        THE COURT:  I know that.  But you are asking me on

23    summary judgment to find that no reasonable finder of fact

24    could find anything other than he had fraudulent intent, but

25    the basis of which you are asking that fraudulent intent be

O1IRWOZo

1    inferred is based on cues and prompts that I don't see in the

2    record here.

3            MR. WEINBERGER:  I understand that, Judge.  I can only

4    say this, and I am fully aware that I am not a witness, but had

5    he checked the box, it would have so said here on Exhibit F.

6            THE COURT:  I know that, but there's no witness.  I

7    mean, think about how I am to write the decision you're asking

8    me to write that explains why a finder of fact would have had

9    to find this.  There's nothing I think I can point to in the

10   record that substantiates what was before him at the time he

11   filled out the form.  How does that question not just simply go

12   to a jury?  He's not moving for summary judgment against your

13   claim, so we don't have to deal with that.  But on the question

14   of why a jury would have to find for you, I don't see how one

15   would get there without a portrait of what the prompts and

16   instructions were to him.

17           MR. WEINBERGER:  I understand your point, Judge.  We

18   can look at the record while Mr. Parker is talking and see if

19   we can come up with --

20           THE COURT:  Okay.  I'm not inviting the record to be

21   supplemented.

22           MR. WEINBERGER:  I understand.

23           THE COURT:  We are at where we're at.  But would you

24   agree with me that if the record does not contain a basis --

25   maybe he admits it.  Maybe he admits what the prompts were.  I

O1IRWOZo

| 1 | don't think anyone has said that to me.  But if the record does |
| 2 | not supply a reliable basis on which to reconstruct what the |
| 3 | instructions were, what the prompts were, what the questions |
| 4 | were, is there some way I can find fraudulent intent on summary |
| 5 | judgment? |

MR. WEINBERGER:  I have to think about that.  I have
to think about that.

THE COURT:  All right.  Okay.  Very good.  Thank you
very much.

Let me ask our court reporter.  Do you need a break?

Mr. Parker, over to you.

MR. PARKER:  Thank you, your Honor.  I don't have
quite as much experience in copyright law as my colleague
Mr. Weinberger, but I have practiced in this court long enough
to see what really good lawyering results in bad law.  And I
think that's kind of what we have here.

THE COURT:  On whose part?

MR. PARKER:  I would on Mr. -- I think that, you know,
DC Comics and Warner Brothers are well represented here.  And
when I tell my kids that my client wrote a Batman story --

THE COURT:  Can you sit down?  That way I can see
everybody, and there's no need for you to stand.  Go ahead.

MR. PARKER:  So when I tell my kids that my client
wrote a Batman story, when I tell my kids that the story
includes the Riddler, the Joker, a character named Alfred, a

O1IRWOZo

```
1   character named Commissioner Gordon, they say, yeah, you can't
2   do that.  All right.  These guys own Batman.
3           But that's not the law.  That's not the law.  We have
4   to look at the statute, and we have to look at the precedential
5   decisions that are relevant to this case, and we'll see that
6   Congress and courts have set really strict limits for what is
7   protected by copyright law.  If we look at the statute, we see
8   that copyright protection under Section 102, I believe, is
9   limited to original expressions of authorship fixed in a
10  tangible medium.
11          If we look at the Supreme Court, we see that DC Comics
12  has to do more than show that this is a Batman story.  They
13  have to do more than show that there are characters named
14  Alfred, there are characters named the Riddler.
15          THE COURT:  Sorry.  What you are beginning with is a
16  defense of the copyright --
17          MR. PARKER:  I apologize.  I --
18          THE COURT:  One moment.  What you are starting with,
19  you brought this lawsuit, and what was striking to me was that
20  by the time we got to summary judgment briefing, you're
21  completely on defense.  You're basically, as you are today, you
22  are starting off defending your client against the counterclaim
23  by DC Comics of copyright infringement, right?  I mean, that's
24  what you're saying to me.  That's what you are addressing right
25  off the bat.
```

O1IRWOZo

1          MR. PARKER:  Your Honor, I am beginning off the bat

2     discussing DC Comics' claims against my client.  I am not

3     starting off on the defensive, or I certainly don't see it that

4     way, because of the way the defense that Warner Brothers is

5     asserting is intertwined with the claims that DC Comics is

6     asserting.  And I think without these claims that DC Comics

7     has, the Warner Brothers case kind of falls apart.  So that is

8     why I'm beginning with the DC Comics claim.

9          THE COURT:  Okay.

10          MR. PARKER:  I certainly don't intend to imply that my

11     client is in a weak position.

12          THE COURT:  Okay.  Go ahead.

13          MR. PARKER:  So I think what we have to do is we have

14     to look at how the law typically works in these situations and

15     what limits that there are to copyright protection.  And that's

16     in the statute, but also, I think the Supreme Court has said

17     that DC Comics -- or I know that they have said in the *Feist*

18     decision——and it's cited in all of the circuit courts——is that

19     DC Comics has to prove that it owns a valid copyright, and it

20     has to prove that my client has unlawfully copied constituent

21     elements that are protected by copyright law.  So that's how we

22     should be looking at this.

23          We shouldn't be asking ourselves:  Is this a

24     Batman story?  We shouldn't be asking ourselves:  Did my client

25     once sign a contract with DC Comics that acknowledged DC Comics

O1IRWOZo

1    owns preexisting material.  If we go back and look at the

2    work-for-hire agreements --

3              THE COURT:  Sorry.  But let's come back to the issue

4    as you framed it.  It's not disputed that DC Comics owns a

5    valid, indeed, multiple valid copyrights that relate to Batman,

6    correct?  There's no doubt it has got copyrights in this space.

7    Put aside the details.  Correct?

8              MR. PARKER:  Correct.

9              THE COURT:  So the issue then boils down to whether

10   your story infringes on protectable elements.

11             MR. PARKER:  I think that's certainly an important

12   part of it, but I think there are issues with respect to

13   summary judgment.  There are issues as to whether or not we

14   have ownership of a copyright that is at issue here.  And this

15   has been pointed out in -- one way to show ownership of a

16   copyright rather than just to assume that they own it, which I

17   think we're all sort of doing here but we can't do that.

18             In order to establish the ownership, you can show or

19   offer a certificate of registration from a U.S. Copyright

20   Office.  That's a *prima facie* case of ownership.  DC Comics has

21   pointed to a number of certificates, but none of these -- only

22   two of these list the DC Comics that is a party to this

23   litigation as a copyright claimant.  So that, to me, is a

24   factual query.  That to me is --

25             THE COURT:  What's the factual query?  If there are

O1IRWOZo

1    two --

2            MR. PARKER:  How do you own this?

3            THE COURT:  If there are two, the certificate supplies

4    *prima facie* ownership.  You have said there are two, at least,

5    in the record that DC Comics has filed.  What's the point,

6    there needs to be more?

7            MR. PARKER:  They need to be tied to what my client is

8    copying, and we don't see it tied.  We don't see a

9    connection between -- so if we look at the two that do list DC

10   Comics as a claimant, we don't know what copyrights we're

11   talking about.  What has my client copied from these works?

12   Now --

13           THE COURT:  Well, I thought what you were saying was

14   that -- I mean, they are saying that in the context of Batman,

15   the well-delineated figure Batman, period full stop, is a

16   protectable element of their copyrights which your client has

17   infringed on.  I think they go a little deeper than that

18   because they've got other associated characters and tropes that

19   are with that, but they are basically saying, given how well

20   delineated Batman is, that alone is protectable.

21           So I'm happy to hear your rebuttal of that, but it's

22   not for a failure of articulation by them of what they are

23   claiming is protectable.

24           MR. PARKER:  Your Honor, I think it is.  I think we

25   have to identify the copyrights that are at issue.  I will

O1IRWOZo

1    accept that the Batman character is sufficiently delineated.

2    We still have to look at, you know, which work are we talking

3    about?  Where has my client copied a work that has been

4    registered and is protected by copyright law?

5         THE COURT:  Sorry.  Wait a minute.  If it's conceded

6    that the Batman figure is sufficiently delineated, and if the

7    Batman figure is at the center of at least two

8    Batman copyrights that have been registered, isn't then the

9    issue of whether your work, the story, essentially uses that

10   sufficiently delineated character?  Why does one have to go any

11   further?

12        MR. PARKER:  I think we have to be more formalistic

13   than that.  I think we have to look at the works that are

14   registered and to see, you know, what is the copyrighted work,

15   and how is it copied.

16        THE COURT:  All right.  You know what the two are

17   because you've indicated you are aware of what the two are.

18   What is it that is different about the Batman figure, let us

19   say, in those two works from the story?

20        MR. PARKER:  I don't know what elements of those two

21   works are being protected by DC Comics.

22        THE COURT:  Well, the Batman figure, does it look

23   different, behave different?  Is it the familiar thing with the

24   black pointy costume?  You tell me.  Is there something

25   different?  I appreciate that the exercise has to be gone

O1IRWOZo

| 1 | through, but I'm asking you to lead me through the exercise

| 2 | that in a way from your perspective leads to an outcome other

| 3 | than infringement.

| 4 | MR. PARKER:  I think, your Honor, we can move then --

| 5 | well --

| 6 | THE COURT:  I'm asking you to make the argument.

| 7 | MR. PARKER:  Right, I understand.  And I'm not sure

| 8 | which elements they are pointing to in those works.  We can

| 9 | assume that, yes, it is Batman from the Batman universe.  We

| 10 | can assume that it is the Batmobile with weapons.  We can

| 11 | assume that it is these different names that are referenced in

| 12 | the summary judgment papers.  But my point is I don't think

| 13 | anything in the summary judgment papers is being pointed to

| 14 | that is being protected by copyright.

| 15 | THE COURT:  Wait a minute.  A moment ago, you, I

| 16 | thought, conceded that the Batman figure is sufficiently

| 17 | delineated to be protected by copyright.  So if one starts with

| 18 | that, are you or are you not using in your work, the story,

| 19 | that delineated Batman figure?

| 20 | MR. PARKER:  I don't think that the Batman is

| 21 | sufficiently delineated in my character -- my client's story

| 22 | such that it is substantially similar to any of the Batmans

| 23 | that we have seen previously.

| 24 | THE COURT:  Sorry.  It's the same character.  It's

| 25 | just at an older age in his life cycle, but it's the same

O1IRWOZo

1    Batman, right?

2              MR. PARKER:  I would --

3              THE COURT:  I mean, you tell me, but I think you

4    acknowledged a couple of times now that the character of

5    Batman is one that has been sufficiently delineated to be

6    protected.  Perhaps what you're saying is that you believe

7    you're describing a different character altogether?  I just

8    don't understand.

9              MR. PARKER:  Okay.  Yeah.  I think we have to back up.

10   Let's look at the cases very quickly.  Let's look at Judge

11   Pauley's decision in *Sapon*.  And so we have to be careful when

12   we say Batman is protected.  So if I say Batman as a character

13   in my story.  Batman, he is an old man.  He fights crime.

14             THE COURT:  Does he live in stately Wayne Manor?

15             MR. PARKER:  He lives in Wayne Manor.  He has a butler

16   named Alfred.  I disagree that that is sufficient delineation.

17   I disagree that that is an expression of a copyrighted work.

18             THE COURT:  He has got foes named Riddler and Joker.

19             MR. PARKER:  He has got foes named Riddler and Joker.

20             THE COURT:  He has a sidekick named Robin.

21             MR. PARKER:  We don't have a Robin here.  Your Honor,

22   I would argue that these are names.  These are names, and when

23   we look at the actual pictures, what the characters look like,

24   how they act, what they do, then that is not similar to what we

25   see in the copyrighted works that are cited in these

O1IRWOZo

1  representations.

2          THE COURT:  If that's the case, how could your

3  copyright claim possibly survive?

4          MR. PARKER:  Because my copyright claim is not

5  dependent upon the names.  My client's copyright claim is

6  dependent upon, we have the Riddler, who is a villain, but he

7  is not just the Riddler.  He is the villain who is out to get

8  Batman or out to get the main hero.  He has come from the

9  surrogate family.  He is on this sort of biblical mission to

10  show the truth.  He believes he understands the secret identity

11  of the hero, and he's going to expose him -- or the -- and the

12  hero is afraid of this as well.

13          There are a number of other items that are -- that I

14  think are, you know, not dependent upon the Batman universe but

15  are present in the movie that would be sufficiently infringing.

16          THE COURT:  In effect what you're saying is that the

17  movie traffics more closely in your Batman than your

18  Batman traffics in the Batman that is the subject of the

19  copyright registrations?

20          MR. PARKER:  I would like to steer clear of using

21  these names, Batman and Robin, for the characters because these

22  are names not necessarily characters.

23          THE COURT:  Well, I mean, that what's good for the

24  goose is good for the gander.  If that's the case, if you strip

25  away Batman, you are dealing with narrative arcs that are put

O1IRWOZo

1    at such a high level of generality, it's hard to imagine that

2    your client's work, the story, could preclude anything.

3            MR. PARKER:  I disagree, and I think -- but we're at

4    this problem --

5            THE COURT:  You are probably knocking out some Indiana

6    Jones movie out there or something, and there's just a bunch of

7    stuff out there that involves heroes and villains and secrets

8    and plots.  It would have seemed to me that the outer bounds

9    that you could be claiming here, assuming there was no prior

10   work by somebody else, would have involved Batman as opposed to

11   just the very broadly put story arc.  Do you have some

12   authority for this?

13           MR. PARKER:  Well, I do, *Nichols v. Universal*

14   *Pictures*, you know.  You have Judge Learned Hand and also Judge

15   Pauley in *Sapon* saying, you know, we have to -- if you look at

16   the very abstract level, then nothing is protected.  You know,

17   bad man fights hero.  All right?  But as we sift it down to

18   more specifics, we do have something that is protectable with

19   my client's story.  So we have this aging hero.  He's, you

20   know, considering giving up and quitting crime fighting.  That

21   is not too abstract.  I think that is -- that is, when compared

22   to this notion of he's about to be found out, he is afraid.

23   He's afraid that his identity and his alter ego is going to be

24   discovered.

25           THE COURT:  I'm sorry.  In the film that you're

O1IRWOZo

1    claiming is infringing, I thought Batman was early in his

2    career, not an aging hero?

3           MR. PARKER:  He is not aging.  All right?  It's

4    flipped, but you still have the same doubt and trepidation.

5    You don't have the same confidence that you would normally

6    have.  So there's this very similar doubt; this idea that, oh,

7    I'm going to retire.  I'm going to give up what -- I'm going to

8    sign over Wayne Industries or this big foundation.  I'm going

9    to give up these tropes of being very wealthy and being very

10   privileged.  And then -- that's on the hero side.  But then on

11   the villain side, you have this very desperate loner, serial

12   killer, who is desperate for attention, who wants the attention

13   of Batman or the attention of the hero, who puts him in

14   different trials, who commits these murders and these serial

15   killings and is bent on this destruction.

16           I think these expressions, these storylines, these

17   plots are similar to both.  And when you look at them all

18   together, it's pretty uncanny that they are all present in the

19   movie in addition to my client's short little story.

20           THE COURT:  Shifting gears to the registration, does

21   the record say anything about the registration process and what

22   your client was presented with in terms of, you know,

23   instructions/questions as he registered the story?

24           MR. PARKER:  The record does not, your Honor.  And

25   I -- I think you would have had to have taken screen shots to

O1IRWOZo

1   determine what questions were asked.

2           THE COURT:  Or to have an expert as to what was being

3   asked at the time.  Your client registered this in 1990?

4           MR. PARKER:  Your Honor, the registration wasn't made

5   until after he --

6           THE COURT:  That's right.  It wasn't registered until

7   when, 2000 and what?

8           MR. PARKER:  I believe it was 2022.

9           THE COURT:  All right.  So your client registered it a

10  year to two ago.  That would presumably not have been hard

11  to reconstruct what the electronic registration -- I take it he

12  registered it electronically?

13          MR. PARKER:  He did, your Honor.  It is my

14  understanding that he did, your Honor.

15          THE COURT:  Did he testify at all at his deposition

16  about the process of registration?

17          MR. PARKER:  I do not recall testimony as to the

18  process of registration, the questions you're asking.  But I

19  can say, your Honor, my client is very convinced that he has

20  registered an original work and that this is his story.

21          THE COURT:  Be that as it may, was there any testimony

22  about his state of mind in not saying anything about other

23  Batman works or about his prior working relationship with DC

24  Comics?  Did he testify one way or the other about those

25  subjects?

O1IRWOZo

1          MR. PARKER:  Did he testify in terms of his prior work

2     with DC Comics.  He did not testify -- he did not testify as to

3     how he registered the works and what he was thinking and

4     whether or not he considered his prior work with DC Comics when

5     he registered his work.

6          THE COURT:  Are you contending that his registration

7     gets him any evidentiary mileage here given that the

8     registration was 30-plus years after the ostensible creation of

9     the story?

10          MR. PARKER:  I'm not sure what the law is on the time

11     span from the creation up to the registration with respect to

12     the *prima facie* benefits that you get from the registration,

13     your Honor, but my client has testified that he -- when you're

14     talking about ownership and when you're talking about a patent,

15     for example, and the certificate, the certificate of patent

16     gives you a property.  When you register a copyright, the

17     certificate of registration does not give you a property.  The

18     property arises upon the creation of the work.  So the

19     certificate's value is it allows you to come to federal court

20     and state your case.  If you register -- prior to --

21          THE COURT:  If you register it within five years,

22     there's a presumption of validity, right?

23          MR. PARKER:  Correct.

24          THE COURT:  Presumption of -- is it validity?

25          MR. PARKER:  It is presumption of ownership and

O1IRWOZo

1   validity.

2           With respect to the registration, if you register

3   prior to the infringement, you know, you get attorney's fees

4   and you get statutory damages.  Those are not the case here,

5   but registration doesn't give a property right.  And in terms

6   of scienter and belief, my client certainly believes that his

7   work is not infringing.

8           THE COURT:  In his deposition, as opposed to

9   elsewhere, did he testify at all about his state of mind in the

10  course of doing the registration?

11          MR. PARKER:  He did not, your Honor.

12          THE COURT:  I mean, in other words, if you were on

13  summary judgment being asked to point to admissible evidence in

14  which you were asked to infer a lack of fraudulent intent, what

15  would you point to?

16          MR. PARKER:  I would point to the fact that throughout

17  the deposition, it is clear that my client firmly believes that

18  this is an original work of art, that it is not a derivative.

19  It is not -- it does not belong to someone else.

20          Now, let's look at the -- he did sign work-for-hire

21  agreements in the 1990s.  Those work-for-hire agreements do

22  say, and he acknowledges, that he is committing this -- he is

23  creating this work.  It will belong to DC Comics, and all

24  preexisting material belongs to DC Comics.

25          THE COURT:  And he's working for DC Comics shortly

O1IRWOZo

1    after 1990, right?

2          MR. PARKER:  Throughout the '90s.

3          THE COURT:  And therefore, the preexisting material

4    that he is referring to?

5          MR. PARKER:  Who knows.

6          THE COURT:  Well, suppose that the 1990 work that he

7    had written was conceded by you——just go with it——to be

8    infringing a copyright either in the Batman or in the

9    surrounding narrative.  Under the work-for-hire agreement,

10   would that mean that he's ceding anything to his preexisting

11   work, or is the preexisting work that is referred to in the

12   work-for-fire agreement referring only to that which belonged

13   to DC Comics?

14         MR. PARKER:  I apologize, your Honor.  I'm not quite

15   following the question.

16         THE COURT:  You had said something about the

17   work-for-hire agreement having him disclaiming something about

18   preexisting works.  I'm trying to understand what you're

19   referring to.

20         MR. PARKER:  I'm referring to the contract that

21   Mr. Weinberger is citing as evidence that my client knows his

22   work is infringing.  And my point is that the language in this

23   contract is not all that clear.  There's certainly no

24   indication that my client knows that his work is infringing and

25   he's not allowed to —— not allowed to create this particular

O1IRWOZo

1    work.

2           THE COURT:  Right.  I don't think Mr. Weinberger is

3    saying that to show fraudulent intent in connection with the

4    registration, your client needs to know that he is infringing.

5    It's more that it's the nondisclosure of the work-for-hire

6    agreements or the other parts of the Batman canon that are what

7    make it fraudulent.

8           MR. PARKER:  Your Honor, I think that the registration

9    process requires you to disclose that your work is like based

10   on a preexisting work.  And I think my client would argue that

11   his -- and I'm here to argue that his work is not based on a

12   preexisting work.  His story is a new and original story.

13          THE COURT:  About a preexisting character?

14          MR. PARKER:  It uses names.  It uses names, your

15   Honor.

16          THE COURT:  I appreciate that it's using names.  We

17   all can follow that.

18          Are you saying, though, that the Batman in your

19   client's work is not based on a preexisting character, Batman?

20          MR. PARKER:  I think what you have to do is you have

21   to ask is it substantially similar to the Batman that we see

22   sufficiently delineated --

23          THE COURT:  Okay.  Let's go with that.

24          MR. PARKER:  -- and my point is it is not.

25          THE COURT:  It's not just because he is at a different

O1IRWOZo

```
1   place in his journey or because it's really a different

2   character?

3          MR. PARKER:  I think it's a different character, your

4   Honor.

5          THE COURT:  They both happen to live in Wayne Manor.

6   They both happen to have Alfred as their butler.  They both

7   happen to have enemies named Riddler and The Joker.  They both

8   live in Gotham City.  At what point is that really defensible

9   to say that they're different characters as opposed to same

10  character, different story?

11         MR. PARKER:  I think when you -- when you see he's an

12  old man.  When he doubts whether he is conning Gotham and the

13  city.  When he is dealing with -- when the Riddler is a serial

14  killer as opposed to the Riddler that we've seen before.  I

15  mean, these are different characters.  These are not the same

16  characters.  They have the same name, but they're different

17  characters.

18         THE COURT:  Anything else on any of the claims you

19  want to bring to my attention today?

20         MR. PARKER:  I would, your Honor.  I would like to

21  point out an issue of ownership that we discussed earlier.  One

22  is the chain of title issue.  There's nothing to connect these.

23  The other issue is authorship.  As has been admitted, this is a

24  joint work by two people, Bob Finger and -- sorry, Bill Finger

25  and Bob Kane.
```

O1IRWOZo

1          THE COURT:  Both though on behalf of DC Comics, no?

2          MR. PARKER:  We don't have any factual record of that.

3     And it is clear that from testimony from DC Comics that at the

4     time of the creation, they were not employees.  So that's --

5          THE COURT:  Where is that clear from?

6          MR. PARKER:  That is in the deposition from DC Comics.

7     So the work was created in '39.

8          THE COURT:  Does DC Comics say they weren't agents of

9     DC Comics at the time?

10          MR. PARKER:  There's no discussion of agency.  The

11     question is whether or not they were employees, and they were

12     not employees when they created it.  They later became

13     employees.  One of the writers was -- or the illustrator was

14     actually compensated later on, and his estate was compensated

15     later on.  The writer, Bill Finger, he was never compensated.

16          THE COURT:  Sorry.  Is the theory here that everyone

17     has been wrong all this time and that DC Comics didn't own the

18     original Batman; it's been owned all this time by these two

19     late individuals?

20          MR. PARKER:  Yes, your Honor.  This was a joint work

21     by two individuals, one of whom was compensated.

22          THE COURT:  But this is an original work.

23          MR. PARKER:  Your Honor, I'm, unfortunately, not the

24     first person to say this.  There are a lot of comic book nerds

25     on YouTube who say the same thing.

O1IRWOZo

1          THE COURT:  All right.  Thank you.  Anything further?

2          MR. PARKER:  Yes, your Honor.  There are a couple of

3    things if you don't mind?

4          THE COURT:  No, go ahead.

5          MR. PARKER:  With respect to like derivative works, I

6    disagree with my colleague.  I think Sections 103(a) and 103(b)

7    do contemplate——and I'm following Judge Pauley in the *Sapon*

8    decision——the idea that a derivative work can have an

9    infringing element but also a protected element in that work.

10   I think that in a situation where the infringing portion of the

11   work dominates the work, then there's no protection.  But --

12         THE COURT:  If that's right though, why does your

13   client then, to the extent that the story is pitched outside of

14   Warner Brothers, strip out the Batman references?

15         MR. PARKER:  Your Honor, I think if you -- well, he

16   stripped out the Batman references because he was trying to

17   sell it to a -- he was trying to sell it to another company who

18   had a different character, so he just changed the names and

19   tried to sell it.

20         THE COURT:  Well, did he believe that if he had sold

21   it as Batman, that other company might have perceived an

22   intellectual property limitation to their using his script?

23         MR. PARKER:  That I cannot answer, but he did believe

24   that they had a black hawk series, so he was pitching it as a

25   black hawk series.  Actually -- ShadowHawk.  That's the other

O1IRWOZo

1    thing, your Honor.  I think if you take out the names of my

2    client's work, if you take out Batman, if you take out Riddler,

3    there's no case here.  There's no infringement case by DC

4    Comics against my client.  So it's all based on the names, not

5    the relationships, not what they do, not how they act, not how

6    they talk, not how the plot moves.

7         THE COURT:  All right.  Thank you.

8         MR. PARKER:  All right.

9         THE COURT:  Mr. Weinberger, a handful of things I know

10   you are going to want to return to based on the colloquy that

11   has just been had.  But just to start where we left off with

12   you --

13        MR. WEINBERGER:  Yes.

14        THE COURT:  -- have you been able to reconstruct

15   anything in the record about the registration process?

16        MR. WEINBERGER:  Yes, your Honor.  So a couple of

17   things.  One is that electronic record of the registration is

18   the only thing that was produced by Mr. Wozniak, so that's all

19   we have.  But as for what is required in the copyright process,

20   I thank my colleague for reminding me of it.  And my mentor

21   taught me this——I wish I had thought of it when I was under the

22   gun a few minutes ago——always go back to the statute when

23   you're stuck.

24        So at page 22 of our brief, we cite Section 409(9) of

25   the Copyright Act, which lays out the requirements for what you

O1IRWOZo

```
 1    are supposed to put in an application.  And Section 9 says, in

 2    the case of a derivative work, an identification of any

 3    preexisting work or works that it is based on or incorporates

 4    in a brief general statement of the additional material covered

 5    by the copyright claim being registered.  So we cite this at

 6    page 22 of our moving brief, and we also cite language from the

 7    compendium, which is like a manual that supports the copyright

 8    act in terms of giving practitioners and filers guidance that

 9    talks about what unclaimable material includes.  It includes

10    "copyrightable material that is owned by a third party, i.e. an

11    individual or legal entity, other than the claimant who is

12    named in the application."

13             THE COURT:  Right.  But if you have a registrant,

14    Mr. Wozniak, who may not be legally trained, what puts him on

15    notice of what Section 409(9) required him to do or the

16    compendium's distillation of that?

17             MR. WEINBERGER:  All I can say is I know what the

18    screen says.  I think Mr. Parker said as much.

19             THE COURT:  No, I know.  Look, I mean -- go ahead.

20             MR. WEINBERGER:  I apologize.  Thank you.

21             In the record in Mr. Wozniak's deposition, which is

22    attached to my declaration, there's a Q&A at page 102:

23    "Q.  Do you recall when you filed this being given an

24    opportunity to disclose preexisting material?

25    "A.  Yes, I do believe that's a question.
```

O1IRWOZo

1    "Q.  You declined to disclose preexisting material?

2    "A.  My story is not based on anything from DC."

3              MR. WEINBERGER:  Question -- and then the question and

4    answer goes on to things that are in his story.  I can continue

5    to read.  This is at page --

6              THE COURT:  But the implication being that he

7    acknowledged the question is put in terms of being given an

8    opportunity.  I take it the implication being that it's not

9    merely an opportunity; it was an obligation?

10             MR. WEINBERGER:  That's our position, yes.

11             THE COURT:  Although the question, as put to him, is

12   not that precise.

13             MR. WEINBERGER:  No.

14             THE COURT:  Look, the challenge for you,

15   Mr. Weinberger, is the fraudulent intent.  And that's a

16   subjective inquiry that is being made about the registrant.

17   Did he or did he not act with fraudulent intent?

18             MR. WEINBERGER:  Well, the answer to his question was:

19   "A.  My story is not based on anything from DC."

20             MR. WEINBERGER:  The next question was:

21   "Q.  Is the Batmobile not from DC?

22   "A.  The Batmobile is traditionally portrayed as a DC thing.

23   "Q.  And Commissioner Gordon?

24   "A.  Yes.

25   "Q.  And Batman?

O1IRWOZo

```
 1       "A.  Yes."

 2                THE COURT:  So your point is --

 3                MR. WEINBERGER:  He knew it.

 4                THE COURT:  -- the finder the fact would find the

 5       denial of anything being based on DC to be a lie, and

 6       therefore, to backout from that, then he must have been acting

 7       with fraudulent intent in not disclosing preexisting material?

 8                MR. WEINBERGER:  Yes.  But I don't think the Court is

 9       required to make a determination about his credibility in order

10       to reach that finding based on other testimony in the record

11       and the contracts.  That's our position.

12                THE COURT:  Right.  Right.  I'm trying to get in the

13       moment of his filling out the registration form.  And since I

14       think you are acknowledging that to prevail on that claim, you

15       need to show fraudulent intent, meaning, subjective, him at

16       that moment.

17                The question is what we can back that out from.  If

18       you had a question on the form that said you must disclose any

19       preexisting material, and then you have him, from your

20       perspective, falsely denying the existence of preexisting

21       material, that's pretty good.  That might get you there.  The

22       way you reported the depo question to me is something short of

23       an obligation.  He was given an opportunity to.  He chose not

24       to do it.  It's not quite as clear as you'd want it to be that

25       he is basically being told you've got to disclose it.
```

O1IRWOZo

1          MR. WEINBERGER:  Well, I can't speak for Mr. Wozniak's

2     state of mind.  I can tell you what the record shows in

3     addition to these questions about his state of mind, about who

4     owned Batman.  I think the Court noted when he went to another

5     publisher, he stripped out Batman.  He did that for a reason.

6     He knew he would get in trouble.

7          THE COURT:  And when was that relative to the

8     registration process?  When did he go to the other publisher?

9          MR. WEINBERGER:  I think that was in the 1990s.  It

10    was years before the registration.

11         THE COURT:  Okay.  All right.  Go ahead.

12         MR. WEINBERGER:  I only wanted to address a few other

13    points very briefly.

14         THE COURT:  Yes.

15         MR. WEINBERGER:  I think the question about chain of

16    title has been answered.  The *Muller* case and some others talk

17    about corporate testimony resolving any chain of title

18    concerns.  The testimony in the Kogan declaration resolves

19    this.  There's been no response.

20         THE COURT:  Chain of title, this means the theory that

21    Batman never came to be owned by DC Comics?

22         MR. WEINBERGER:  Well, there's two issues.  There's

23    the fact that many of the registrations list National

24    Periodical Publications or Detective Comics, which are

25    predecessor entities to DC Comics.  That is dealt with in

O1IRWOZo

1    Mr. Kogan's testimony.

2            The second question that Mr. Parker raised about

3    authorship.  I query whether Mr. Wozniak has the ability to

4    challenge on behalf of Bob Kane and Bill Finger who the owner

5    of Batman is.  I don't think he belongs in that discussion.

6    But in any event, that is a long-settled question.  My clients

7    filed copyrights in its own name for these properties for

8    years.  And Mr. Wozniak was given copies of some of the

9    underlying agreements with these writers and artists that

10   confirm all of the above, so I don't think there's any issue

11   here.

12           THE COURT:  Somewhat separate, somewhat related, early

13   in the argument from Mr. Parker, he said, I believe, that there

14   were only two copyright certificates, I think, that had been

15   filed and was suggesting that there was some inexactitude about

16   what the relationship was between them and the story?

17           MR. WEINBERGER:  No, I -- well, Mr. Parker can answer

18   that.

19           We have about, I think, 25 certificates that are part

20   of the record.  There are only two that say DC Comics on them

21   because most of them predate the existence of the entity known

22   as DC Comics.

23           THE COURT:  I see.

24           MR. WEINBERGER:  I do that Mr. Parker's point is that

25   his client -- and he and I have been talking about this since

O1IRWOZo

1    day one of this case.  His client continues to ask:  What work

2    am I infringing?  And our answer remains all of them.

3            THE COURT:  In other words, all of them, each

4    individual one, standing on its own if nothing else existed,

5    would give you a copyright in this Batman character and

6    surrounding associations?

7            MR. WEINBERGER:  Well, I'm not sure I can answer that.

8    I can tell you that a single certificate would get us into

9    court on our affirmative claim against Mr. Wozniak.  As to what

10   you would need to be able to prove character rights in a

11   particular property, it's -- that's an impossible question to

12   answer.  It depends on what the character is, what the property

13   is.  It might be able to be done in a single work like these

14   novels.  You know, comics, it takes more because there's less

15   on the page and it's shorter.  But I certainly believe that

16   with the material before the Court and the prior precedent,

17   there's really no question about it.

18           The last point I did not get to touch in my earlier

19   discussion about issues about access and independent creation,

20   which I don't need to get into.  I just wanted to --

21           THE COURT:  Yes.  I read what you wrote.  I didn't

22   have questions on that.

23           MR. WEINBERGER:  The last point I wanted to make is

24   really building on something Mr. Parker said and your

25   interaction, which is the position in order avoid the

O1IRWOZo

```
1     consequence of the infringement of DC Comics copyright by the
2     story, Mr. Wozniak has had to really twist and contort and say,
3     well, my Batman is different from your Batman.  That's the way
4     he is a non-infringer.  And we don't agree that that is the
5     proper analysis.  But I do want to say this:  If that's the
6     proper analysis, if the Court is accepting it, there's no world
7     in which the film that my client is accused of infringing could
8     possibly infringe something that is not, according to
9     Mr. Wozniak, derivative of my client's rights.
10            THE COURT:  His argument is that even if you strip
11    away all the identifiers, the narrative ark is sufficiently
12    specific and similar across the two that that would be the
13    source of an infringement claim.
14            MR. WEINBERGER:  Well, we certainly understand that
15    argument.  I think the works can speak for themselves.  One can
16    read the works and watch the movie, and it doesn't take long to
17    understand that while they may have certain high-level plot
18    similarities as it relates to films with villains and heroes
19    and villains who taunt heroes and Armageddon-type-judgment-day
20    endings, which most action movies have in some form or another,
21    you won't find the kind of similarities that are actionable.
22            THE COURT:  Anything further?
23            MR. PARKER:  From me, your Honor?
24            THE COURT:  No, from Mr. Weinberger.  Anything
25    further?
```

O1IRWOZo

1          MR. WEINBERGER:  No, your Honor.

2          THE COURT:  Mr. Parker, anything further from you?

3          MR. PARKER:  Yes, I just wanted to go back to the

4   statute of limitations and the arguments of implied license,

5   which are in our papers, but, you know, there certainly was an

6   implied license.  My client was working day-to-day with the

7   editors at DC Comics.

8          THE COURT:  Applied license to do what?

9          MR. PARKER:  Applied license to create material based

10  on preexisting Batman characters and submit to DC Comics.

11         THE COURT:  But implied license to submit it to DC

12  Comics; are you saying that there was an implied license to

13  peddle it to the outside world for your client's benefit?

14         MR. PARKER:  Your Honor, that's a very good point.

15  I'm glad you raised it.  This is something that you and

16  Mr. Weinberger were discussing.

17             When we're talking about infringement, we're not

18  talking about claims of ownership.  We're not talking about the

19  ability to submit it for commercial -- for commercial benefit.

20  We're talking about:  Did you copy?  Did you distribute?  Did

21  you publicly display?  Those are the rights.  The copyrights

22  are set forth in Section 106.  And Section 106 does not say,

23  oh, the right to claim ownership.  Section 106 does not say,

24  oh, you're not allowed to -- you're not allowed to submit for

25  payment this work.  So that's what we're talking about.  So

O1IRWOZo

```
1   we're talking about he had an implied license to use these

2   materials to create, to distribute and to publicly display

3   these works of art.

4              THE COURT:  All right.  Thank you.  The case is

5   submitted.  I thank counsel for the energetic and helpful and

6   insightful argument, and you'll hear from me relatively soon.

7   Thank you.  We stand adjourned.

8              (Adjourned)
```